# United States Court of Appeals
## For the First Circuit

No. 11-2246

KATHERINE KELLEY,

Plaintiff, Appellant,

v.

CORRECTIONAL MEDICAL SERVICES, INC.,

Defendant, Appellee.


APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]
[Hon. Margaret J. Kravchuk, U.S. Magistrate Judge]


Before

Lynch, Chief Judge,
Torruella and Lipez, Circuit Judges.


Guy D. Loranger, with whom Nichols, Webb & Loranger, P.A., was on brief, for appellant.
Matthew J. LaMourie, with whom Michael G. Messerschmidt and Preti, Flaherty, Beliveau & Pachios, LLP was on brief, for appellee.


February 6, 2013

**LIPEZ**, **Circuit Judge**.  Plaintiff Katherine Kelley appeals from the district court's grant of summary judgment in favor of defendant Correctional Medical Services, Inc. ("CMS") on her retaliation claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12203(a), and the Maine Human Rights Act ("MHRA"), Me. Rev. Stat. Ann., tit. 5, § 4572(2).  Kelley contends that the district court erred in finding that she had failed to raise a genuine dispute of material fact as to whether CMS's stated reason for her termination was a pretext for retaliatory animus. Concluding that Kelley has presented sufficient evidence to bring to a jury, we vacate the entry of summary judgment on her retaliation claims.[1]

## I.

The facts are drawn from the deposition testimony and affidavits, as well as documentary evidence.  We recount the relevant events in the light most favorable to the nonmoving party, see Roman v. Potter, 604 F.3d 34, 38 (1st Cir. 2010), and draw all reasonable inferences in her favor, see Acevedo-Parrilla v. Novartis Ex-Lax, Inc., 696 F.3d 128, 131-32 (1st Cir. 2012).

---

[1] The district court also granted summary judgment on Kelley's claim for failure to accommodate under the ADA and her state law slander claim.  Kelley has not raised those claims on appeal and they are therefore waived. Rodríguez v. Mun. of San Juan, 659 F.3d 168, 175 (1st Cir. 2011).

## A. The CMS Facilities and Kelley's Job Responsibilities

CMS provides medical staffing and health care services for the inmates at the Maine State Prison. Kelley is a licensed practical nurse and began employment with CMS at the prison in spring 2007.

CMS staff treats inmates at the prison in five locations. Three of these are relevant here: the main clinic, the infirmary, and the "close unit." In the main clinic, inmates receive treatment for various medical issues. Patients similarly receive treatment in the infirmary, but can remain there for longer periods or overnight if they require constant monitoring. The close unit serves as a site for distributing medication to the inmates.

Nurses stationed at the main clinic bear responsibility for the narcotics count, also called "the count." At the conclusion of each shift, the outgoing nurse and the incoming nurse count the narcotics stored at the clinic together, after which the outgoing nurse gives the keys to the clinic to the incoming nurse. The count and the handover of keys signal the transfer of responsibility for the main clinic from one nurse to the other.

Responsibility for the main clinic also includes the obligation to respond to medical emergencies, called "code blues." A code blue typically requires personnel on duty to respond from their station to the place where the inmate was located within a certain time. Code blues sometimes require personnel to respond to

locations physically distant from their stations, bringing with them emergency medical equipment, such as a stretcher.  During a code blue, one staff member typically remains behind in the clinic to call a doctor and prison security, as well as pull the patient's charts.

During Kelley's employment, most of her regular shifts were in the close unit, but she worked at times in other locations, including the infirmary.  She did not express a preference for working in one unit over another.  Toward the end of her employment, her assignments sometimes changed on short notice. Kelley knew how to conduct the narcotics count as part of her responsibilities.

## B.  Kelley's Disability and Her Interactions with Kesteloot

In July 2007, Kelley shattered the right side of her pelvis during a horseback riding accident.  As a result, she required surgery and took a leave of absence that lasted approximately six weeks.

Theresa Kesteloot, Kelley's supervisor, had been a CMS employee since July 2006, and was transferred to Maine State Prison sometime during Kelley's leave of absence.  Before Kelley returned to work, a representative of CMS's Human Resources Department sent her an email stating that if she could not return to work after her

leave of absence, she would be reduced to PRN status.[2] The email referred to Kesteloot having "an issue about her and PRN status," and suggested that Kelley contact the Human Resources representative to discuss the matter further. Kelley also avers that during her leave of absence, Kesteloot told her on the phone that she would be fired if she did not work full time after her leave and that she did not want Kelley to return to work on an as needed basis.

On September 17, 2007, Kelley returned to work with a medical note outlining her restrictions. The note stated that she should use crutches for ambulation, she could not use her hands for lifting, and her ability to bend and squat was limited. The note also indicated that she could lift, push, and pull objects as long as she stayed seated.[3]

The first night Kelley returned to work, Kesteloot told her that her doctor's note regarding her medical restrictions had not been provided on the appropriate CMS form, and that Kelley could not commence working until she provided a doctor's note on the correct form. The director of nursing overruled Kesteloot and permitted Kelley to work her shift. As Kesteloot was providing

---

[2] "PRN" stands for "pro re nata," a Latin phrase that roughly translates to "as needed."

[3] Kelley was subsequently given two more doctor's notes in October and December of 2007, which stated that she was permitted to use crutches or a wheelchair at work, and that bending and squatting should be limited to infrequent episodes during the day.

Kelley with the proper form, however, she asked Kelley, "seriously, what are your expectations?" Kelley responded that she intended to return to work with the use of a cane.

During the first three months after Kelley returned to work, she worked primarily in the infirmary and the main clinic. Kelley "sometimes" responded to code blues if they were in other units; "once or twice" she used crutches to respond to code blues in the close or medium unit. After some time, Kelley returned to her pre-injury assignment in the close unit. She nonetheless worked in the main clinic when necessary.

Throughout 2008, Kelley's leg and health problems impeded her ability to work double shifts and she began using a cane at work. Kesteloot told her not to use the cane until and unless she obtained medical authorization to do so.[4] In response, Kelley procured notes from physicians stating that she should be permitted to use a cane; these notes also limited her to working only 10.5 hours at a time.[5]

---

[4] In April 2008, Kesteloot wrote Kelley a memo informing her that her restriction sheet had expired, and that until she submitted a new restriction form, "there are no restrictions concerning your work."

[5] At various points in her briefs and deposition testimony, Kelley states that Kesteloot "took away" her cane, suggesting that Kesteloot removed her cane by force. This contention finds no support in the record, which shows only that Kesteloot forbade her from bringing the cane to work until she provided a doctor's note authorizing its use.

Kelley avers that on several occasions after her return, Kesteloot suggested that she was misrepresenting the extent of her injuries and that she would be unable to walk if she had truly fractured her pelvis.[6]  Kesteloot also consistently criticized Kelley's job performance, and put written comments that she had not seen before in her employment file.  Violet Hanson, a member of CMS management, told Kelley that Kesteloot "wanted [her] gone."

In July 2008, Kelley's medical providers recommended that she have a second hip surgery, which would likely require another lengthy leave of absence.  Kelley testified that she "believe[s] she had a discussion" with Kesteloot concerning her second surgery.

## C.  The October 17, 2008 Night Shift

On the night shift of October 17, 2008, which runs from 10 PM to 7:30 AM, matters came to a head between Kelley and Kesteloot.  Although Kelley was on vacation on that date, she received a call asking her to take a shift in the close unit in place of another nurse who had been originally scheduled to staff the unit.  She arrived for work at around 10 PM.  By the time she arrived, however, a second employee also needed a substitute, requiring a staffing reshuffle.  Since a nurse was not required to

---

[6] The record does not disclose the dates these incidents took place.  Kelley's statement of material facts states that the "last" of these conversations took place on July 22, 2008, but the only evidence cited to support this contention is Kelley's affidavit, which states that these incidents took place on "three occasions" without specifying when.

staff the close unit until it was time to set up the medications at around 3:30 or 4 AM, Kelley's assignment was changed to the main clinic without her knowledge.

Bruce Lumsden was the registered nurse on duty in the main clinic when Kelley arrived. Kelley noted the alteration in her assignment, and discussed the matter with Lumsden. Kelley told him of her mobility restrictions and stated that her leg was bothering her that day. She expressed concern about her ability to respond to a code blue, in part because she would have difficulty lifting the stretcher. She asked to switch responsibilities with Ann Voorhees, a nurse who was scheduled to work in the infirmary, since the infirmary was generally a lighter assignment than working in the clinic. Lumsden responded that Kelley should ask Voorhees to switch positions.

Kelley then approached Voorhees and requested the switch, but Voorhees initially refused. Lumsden then left Kelley in the main clinic alone and went to speak to Voorhees. Upon his return, he informed Kelley that he and Voorhees had spoken with Kesteloot via telephone, and that Voorhees had agreed to come out of the infirmary since that location did not require constant supervision. Pursuant to Kesteloot's instructions, Kelley and Voorhees were to staff the main clinic together, and the latter would do any "running around" that was needed. After this conversation, Lumsden

did the narcotics count for the main clinic with another nurse, Deborah Hill, and left.

Contrary to the agreed-upon arrangement, Voorhees refused to leave the infirmary, stating that she had barely slept the night before and did not want to take on the additional clinic responsibilities. Kelley told Hill that she could not staff the clinic alone due to her leg problems and her lack of familiarity with the position. She further noted that responsibility for the main clinic would obligate her to respond to code blues and that staffing the clinic would be too stressful for her.[7] Kelley stated that she wanted to go home rather than assume responsibility for the main clinic. Hill, who had already worked two shifts prior to the night shift, wanted to leave work, but could not do so until she did the narcotics count with another nurse, thereby transferring responsibility for the main clinic.

Kelley then called Kesteloot at home and requested her help in getting Voorhees to leave the infirmary and assist Kelley in the main clinic. The call was transferred to the infirmary, and Voorhees got on the line and spoke with Kesteloot. Voorhees subsequently came to the main clinic and told Kelley that the three of them, as well as Hill, would speak together about the situation, with Kesteloot participating via speakerphone.

_____

[7] Kelley testified that she believed she "could have" responded to code blues, but that doing so would have been awkward and that people would have laughed at her.

## D. The Speakerphone Conversation and Aftermath

During the pivotal speakerphone call, Kesteloot attempted to enforce her original plan of having Voorhees leave the infirmary to assist Kelley in the main clinic. Kesteloot told Kelley, however, that "it was only fair" that Kelley conduct the narcotics count for the main clinic because Voorhees had already done the count in the infirmary. Hill and Kelley mentioned that Hill had already conducted a proper count with Lumsden. Kesteloot responded that Kelley should conduct the count with Hill nonetheless, but Kelley reiterated that the count had already been done and refused to accept the clinic keys.[8] She expressed her belief that the main clinic assignment would "require[] too much physical activity" and that she did not feel "comfortable with the physical responsibilities of [being in] charge in the clinic."[9] Kelley also made a remark about leaving work because she could not accept responsibility for the clinic. Kesteloot responded that if she left, she would be fired and reported to the Board of Nursing for abandoning her post.

---

[8] Kelley quibbles with the characterization that she "refused" responsibility for the clinic, but during her deposition she herself stated that she "refused to accept the keys."

[9] These quotations come from Hill's recollection of the crucial speakerphone conversation.

-10-

Kesteloot asked Kelley if she was "refusing to go and count the narcotics and sharps[10] in the clinic as your supervisor is asking you to do," and noted that refusing to take the keys was tantamount to disobeying a direct order. Kelley expressed her willingness to remain on duty in the main clinic, but persisted in refusing to do the narcotics count.

At some point in the midst of the call, Voorhees stated that she would "do it all," including the narcotics count in the main clinic. The last thing Kesteloot stated on the speakerphone call was that she would call back to the infirmary to speak with Voorhees alone. The call had taken about ten minutes in total.

After the speakerphone call, Kelley remained in the clinic and began doing paperwork. Voorhees returned to the infirmary and had a separate phone conversation with Kesteloot, who asked Voorhees to have security call her at home so that she could arrange to have Kelley escorted off the premises. Kesteloot had two security officers escort Kelley out of the building at around midnight.

After Kesteloot spoke with security, she became nervous about her decision to remove Kelley and reviewed the CMS Success Guide, a personnel manual for CMS employees. The guide contained language indicating that refusing the main clinic assignment was a

---

[10] The term "sharps" refers to devices such as needles and scissors that could cause wounds or punctures in those handling them.

-11-

serious disciplinary offense.  After preparing her own written statement and obtaining one from Voorhees, Kesteloot submitted a written recommendation to her superiors on October 28, 2008, stating that Kelley should be terminated for failure to carry out her supervisor's reasonable instruction.  This recommendation was also provided to CMS's Human Resources Division, which agreed with Kesteloot's assessment.[11]  Kelley was fired the next day.

Kelley then filed a complaint in the district court alleging, inter alia, that Kesteloot recommended her termination in retaliation for Kelley's request for an accommodation on the night of October 17, 2008.  The case was referred to a magistrate judge, who issued a lengthy memorandum opinion granting summary judgment in CMS's favor.  The court ruled that Kelley had failed to adduce evidence that Kesteloot's stated basis for terminating Kelley was pretextual, and concluded that Kelley's evidence of retaliatory animus was too conclusory and speculative to take to trial.  After appellant filed an objection, the district court heard argument on

---

[11] The parties disagree as to whether Kesteloot or the HR department had the final say as to whether Kelley should be terminated.  Kesteloot was undisputedly part of the decisionmaking process, however, and CMS does not contend that the HR department's decision somehow broke the causal chain leading to Kelley's termination.  Accordingly, this distinction is immaterial. See Sánchez-Rodríguez v. AT&T Mobility P.R., Inc., 673 F.3d 1, 15 (1st Cir. 2012) (observing that retaliation claim requires plaintiff to point to "'some evidence of retaliation by a pertinent decisionmaker'" (quoting Randlett v. Shalala, 118 F.3d 857, 862 (1st Cir. 1997)).

-12-

the matter and subsequently affirmed the magistrate judge's ruling in a brief order.  This timely appeal followed.

## II.

To survive summary judgment on a retaliation claim, the plaintiff "must establish a genuine issue of material fact as to whether [s]he . . . was retaliated-against within the meaning of the ADA."  Carreras v. Sajo, Garcia & Partners, 596 F.3d 25, 32 (1st Cir. 2010) (citing Fed. R. Civ. P. 56(c)).[12]  We review the district court's grant of summary judgment de novo.  See Cabán-Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 8 (1st Cir. 2007).  "Summary judgment is appropriately granted where there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law."  Vives v. Fajardo, 472 F.3d 19, 21 (1st Cir. 2007).  In reviewing the facts, we "draw all reasonable inferences in the light most favorable to the nonmovant."  Cabán-Hernández, 486 F.3d at 8.

### A.  Retaliation Claims Under the ADA

A retaliation claim under the ADA is analyzed under the familiar burden-shifting framework drawn from cases arising under Title VII.  See Freadman v. Metro. Prop. and Cas. Ins. Co., 484

---

[12] Generally, disability-related claims under the MHRA are "construed and applied along the same contours as the ADA."  Dudley v. Hannaford Bros. Co., 333 F.3d 299, 312 (1st Cir. 2003).  Kelley does not assert that her state law claims are distinguishable in any material way from her federal claims, so we apply the same analysis to both.

F.3d 91, 106 (1st Cir. 2007); see also Soileau v. Guilford of Maine, Inc., 105 F.3d 12, 16 (1st Cir. 1997) (observing that "guidance on the proper analysis of [an] ADA retaliation claim is found in Title VII cases"). To make out a prima facie retaliation claim, the plaintiff must show that: "(1) she engaged in protected conduct; (2) she experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 25 (1st Cir. 2004). Once the plaintiff has made a prima facie showing of retaliation, the defendant "must articulate a legitimate, non-retaliatory reason for its employment decision." Id. at 26. If the defendant meets this burden, the plaintiff must show that the proffered legitimate reason is pretextual and that "the job action was the result of the defendant's retaliatory animus." Id. (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993)). Requesting an accommodation is protected conduct under the ADA's retaliation provision. Freadman, 484 F.3d at 106.

The district court found that Kelley had made out a prima facie retaliation claim, and that CMS had adduced sufficient evidence of a legitimate, non-discriminatory reason for her termination, namely, Kelley's refusal to obey her supervisor's instruction. The only issues on appeal are whether the district court erred in concluding that Kelley failed to raise a genuine

-14-

dispute of material fact as to pretext and retaliatory animus. While summary judgment may be appropriate even "'where elusive concepts such as motive or intent are at issue,'" Vives, 472 F.3d at 21 (quoting Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)), we have stated that "where a plaintiff . . . makes out a prima facie case and the issue becomes whether the employer's stated nondiscriminatory reason is a pretext for discrimination, courts must be 'particularly cautious about granting the employer's motion for summary judgment.'" Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 167 (1st Cir. 1998) (quoting Stepanischen v. Merchants Despatch Transp. Corp., 722 F.2d 922, 928 (1st Cir. 1983)).

"[T]here is no mechanical formula for finding pretext." Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 39 (1st Cir. 2003) (internal quotation marks omitted). Instead, "[i]t is the type of inquiry where 'everything depends on the individual facts.'" Id. at 40 (quoting Thomas v. Eastman Kodak Co., 183 F.3d 38, 57 (1st Cir. 1999)). The inquiry focuses on whether the employer truly believed its stated reason for taking action adverse to the employee. See Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 7 (1st Cir. 2000). The plaintiff bears "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000) (alteration in original) (internal quotation mark omitted).

-15-

Here, there is substantial overlap between Kelley's evidence of pretext and of discriminatory animus. See Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 54 (1st Cir. 2000) (stating that plaintiffs "may use the same evidence to support both conclusions, provided that the evidence is adequate to enable a rational factfinder reasonably to infer that unlawful discrimination was a determinative factor in the adverse employment action" (quoting Thomas, 183 F.3d at 57) (internal quotation marks omitted)). Consequently, in order to determine whether CMS's asserted justification was a mask for retaliatory animus, we must review the history of Kelley and Kesteloot's interactions regarding the former's earlier requests for accommodations.

## B. The Evidence of Pretext and Retaliatory Animus

As noted, the record shows that long before the crucial events of October 17, 2008, Kelley and Kesteloot had a number of disagreements regarding Kelley's need for accommodation. Even before Kelley returned to work after her medical leave, Kesteloot suggested that she would not be permitted to return unless she could come back full time. When Kelley did in fact return from her leave of absence, Kesteloot tried to prevent her from working until she returned with a properly formatted doctor's note describing the extent of her injuries. Kesteloot's own supervisor overruled this decision and permitted Kelley to begin work and bring a properly formatted note at a later date. Moreover, Kelley's affidavit

-16-

states that Kesteloot "accused [her] of lying about having a fractured pelvis and no hip socket" and suggested that she would essentially be immobile if her injuries were truly that extensive. There was also the evidence that Kesteloot prohibited Kelley from using a cane until she returned with a doctor's note stating that she was required to use the cane to aid her mobility, despite the fact that Kelley's disability was more than evident. Taken together, this circumstantial evidence could lead a jury to conclude that Kesteloot was repeatedly hostile to any accommodation of Kelley's disability.

Importantly, Kesteloot's comments and actions were consistently linked to Kelley's disability and her need for accommodation. Hence, the presence of discriminatory animus is a reasonable inference that arises from these interactions, thereby distinguishing this case from those where the employer's proffered basis for its adverse action may have been false, but the record contains little to no evidence suggesting that the adverse action stemmed from an unlawful motive. See Reeves, 530 U.S. at 148 (observing that summary judgment may be appropriate in cases where "the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred"). Also, the consistent links between Kesteloot's hostility and Kelley's disability distinguishes this case from that

of the plaintiff in Roman, a Title VII case on which appellees rely.  In that case, we rejected the plaintiff's numerous claims of retaliation partly on the basis that she had relied heavily on her "subjective belief in retaliation," rather than on concrete evidence of animus.  604 F.3d at 41.  The record in Roman showed that the employer had taken numerous adverse actions against the plaintiff that were well supported by legitimate nondiscriminatory reasons, without any evidence connecting those adverse actions to Roman's protected activity.  Id. at 40-42.  By contrast, the evidence in this case describes exchanges between Kelley and Kesteloot that were closely connected to the former's requests for accommodations for her disabled status, and Kesteloot's resistance to these accommodations.

This background of disability-based animus is also probative of a pretextual ground for terminating Kelley's employment.  One well-established method of demonstrating pretext is "to show that discriminatory comments were made by the key decisionmaker or those in a position to influence the decisionmaker."  Santiago-Ramos, 217 F.3d at 55; see also Domínguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 433 n.6 (1st Cir. 2000); Palasota v. Haggar Clothing Co., 342 F.3d 569, 578 (5th Cir. 2003) (observing that remarks related to protected characteristic "are appropriately taken into account . . . even where the comment is not in the direct context of the termination")

-18-

(citation omitted) (internal quotation marks omitted). As described above, Kesteloot's interactions with Kelley extended beyond mere comments or remarks suggestive of animus. On repeated occasions, Kesteloot exhibited her resistance to accommodating Kelley through both her words and her conduct prior to October 17, 2008. See Mesnick v. General Elec. Co., 950 F.2d 816, 828 (1st Cir. 1991) (observing that plaintiff may meet pretext burden by relying on "comments by the employer which intimate a retaliatory mindset").

The events of October 17 may reasonably be viewed as the culmination of this history of disability-based conflict. On that evening, Kelley requested yet another accommodation for her disability, precipitating a confrontation between Kesteloot and Kelley regarding what kind of accommodation was appropriate. Notably, during the crucial speakerphone call, Voorhees eventually agreed to "do it all," including doing the narcotics count and taking the clinic keys. Although this concession seemingly resolved the dispute, Kesteloot nonetheless proceeded to have Kelley escorted from the premises after the call ended, and promptly recommended her termination. Such conduct suggests her eagerness to be rid of Kelley. Under these circumstances, a reasonable factfinder could conclude that Kelley's refusal to obey an instruction of Kesteloot served as a convenient pretext for eliminating an employee who had engaged in ADA-protected conduct

one too many times. See Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003) (holding, in case where employee was terminated "immediately after returning from medical leave and requesting accommodation," that employee had raised triable issue as to whether alleged insubordination or request for accommodation had motivated his discharge).

Put another way, a reasonable factfinder could find that Kesteloot's action against Kelley was "a disingenuous overreaction to justify dismissal of an annoying employee who asserted [her] rights under the ADA," rather than the firing of an insubordinate employee. Miller v. Ill. Dep't of Transp., 643 F.3d 190, 200 (7th Cir. 2011); cf. Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 190 (3d Cir. 2003) (holding that employee had adduced sufficient evidence that employer had "tired of her persistent requests for an accommodation" and therefore "fired [her] in retaliation for her protected activity rather than (or in addition to) her insubordinate behavior").

In granting summary judgment, the district court focused almost exclusively on Kelley's insubordination. The court concluded that on October 17, Kesteloot had made an effort to accommodate Kelley by requiring Voorhees to handle the physically demanding duties, thereby rendering baseless Kelley's resistance to assuming responsibility for the main clinic. Although this view of the record is reasonable, it disregards the record evidence of

Kesteloot's ongoing disability-based animus and the way in which that animus might have influenced Kesteloot's adverse employment action against Kelley.  Moreover, an employer's seeming willingness to accommodate an employee's disability does not conclusively preclude a finding that the employer was motivated by retaliatory intent.  Cf. Soileau, 105 F.3d at 16 (stating that it would be "anomalous" to interpret the ADA as "leav[ing] employees unprotected if an employer granted the accommodation and shortly thereafter terminated the employee in retaliation").  Although CMS tries to explain Kesteloot's prior conduct as merely a supervisor's diligent adherence to protocol, it is insufficient at this stage of the case to depict Kesteloot's actions as "arguably non-discriminatory," Acevedo-Parrilla, 696 F.3d at 144.  Where "permissible inferences that could be drawn from the facts" support the employee's claims, the employer is not entitled to summary judgment.  Dominguez-Cruz, 202 F.3d at 433.  There are such inferences here.

### III.

While the ADA is not "a license for insubordination at the workplace," Reed v. LePage Bakeries, Inc., 244 F.3d 254, 262 (1st Cir. 2001), the employer cannot invoke the specter of insubordination in order to "mask[] retaliation for requesting [an] accommodation."  Wright, 352 F.3d at 478.  Kelley has raised triable issues as to whether Kesteloot conveniently seized upon

Kelley's refusal to assume primary responsibility for the main clinic as a basis for her termination, and whether this decision was the product of retaliatory animus.  We therefore <u>vacate</u> the district court's entry of summary judgment in CMS's favor on Kelley's retaliation claim under the ADA and MHRA and <u>remand</u> for further proceedings.  Costs are awarded to the appellant.

**<u>So ordered.</u>**