# United States Court of Appeals
## For the First Circuit

No. 19-1961

KIRSTIE TRAHAN,

Plaintiff, Appellant,

v.

WAYFAIR MAINE, LLC,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Lance E. Walker, U.S. District Judge]

Before

Howard, Chief Judge,
Selya and Lynch, Circuit Judges.

Brett D. Baber, with whom Lanham Blackwell & Baber was on brief, for appellant.
Katharine I. Rand, with whom Daniel R. Strader and Pierce Atwood LLP were on brief, for appellee.

April 21, 2020

**SELYA**, **Circuit Judge**.  This disability discrimination case requires us to hold steady and true the balance between the important workplace protections that Congress has put in place for disabled employees and the ancient right of employers to discipline (or even discharge) employees, whether or not disabled, for violations of clearly established, neutrally applied conduct rules.  At a granular level, the case pits plaintiff-appellant Kirstie Trahan, a military veteran who suffers from post-traumatic stress disorder (PTSD), against her former employer, defendant-appellee Wayfair Maine, LLC (Wayfair).  The district court entered summary judgment in favor of Wayfair, and Trahan now appeals.  After careful consideration, we affirm.

## I. BACKGROUND

Because the district court granted summary judgment against Trahan, we rehearse the facts in the light most favorable to her, consistent with record support.  See Suzuki v. Abiomed, Inc., 943 F.3d 555, 557 (1st Cir. 2019).  Trahan was the victim of a sexual assault while serving in the United States Army and, as a result, was diagnosed with PTSD.  She received a medical discharge in September of 2010.  From and after her Army discharge, she has received regular outpatient treatment and has taken medications for her condition.  When Trahan suffers acute PTSD episodes, she flashes back to the initial trauma that she experienced and has difficulty in perceiving reality.

Trahan's mental health counselor explained that her triggers for PTSD flashbacks "by nature are unpredictable and atypical" and, thus, impossible "to eliminate" entirely. Some common triggers include feelings of "losing control" and "being ganged up on." The counselor also observed that Trahan exhibits cognitive distortions and emotional dysregulation, during which she experiences difficulty grasping reality and controlling her emotional responses.

Trahan worked various jobs (including jobs in call centers) after her medical discharge from the Army. In August of 2017, Wayfair hired her as an employee, specifically, as a sales and service consultant at its call center in Bangor, Maine. That position entails providing customer service over the telephone. The call center has an open floorplan in which consultants sit in "very close proximity to one another." Consultants work on teams and, thus, are obliged to work collaboratively. The company's General Rules of Conduct (the Conduct Rules) require employees to treat one another professionally and cooperatively. Offending employees were discharged for unprofessional interactions (such as emotional outbursts and fits of anger) with colleagues. In September of 2017 — the time frame relevant to this case — Wayfair neither permitted employees to work from home nor had the technological capabilities to support such an arrangement.

Trahan did not disclose her PTSD to Wayfair when she was hired. The first two weeks of her employment consisted of classroom training with more than a dozen of her fellow trainees. During this period, Trahan felt excluded by some of her new colleagues, especially a "tight-knit" group that included Ashley McDonald and Brianna Ireland.

The trainees were moved to the sales floor for "nesting" before being assigned to permanent teams. During this phase of their training, the trainees took calls from customers with support from veteran employees known variously as floorwalkers and nesting coaches. Trahan came to believe that her co-workers were making fun of her. She complained to her nesting coach, Thoma Noddin, that she felt as though her peers were creating "a clique environment," adding that the environment made her "feel very similar to how [she] felt . . . in the Army" and that it was "affecting certain things to come out in [her] life" — things that she preferred to avoid.

On one occasion during the September training, Trahan sought assistance with her work. A floorwalker knelt at her workstation and suggested a solution. Trahan perceived the floorwalker's tone as overbearing and became uncomfortable when he touched her arm. After stating that she was losing patience with him and could not remain in his presence, she abandoned her workstation and then experienced a PTSD episode in the privacy of

a bathroom stall.  She told Noddin that the episode had triggered a PTSD flashback, but she did not say anything further to suggest that she was using the term "PTSD" in a clinical (rather than casual or colloquial) manner.

On September 20 — before being assigned to a permanent team — Trahan directed a comment toward McDonald.  Ireland interjected herself into the exchange, and Trahan admonished Ireland not to be "ignorant."  Trahan then threw her headset and slammed down her phone.  As a result of the conflict, Trahan felt triggered:  she began to sweat, lost awareness of what was happening, and blacked out from a PTSD flashback.  She later explained that she interpreted Ireland's tone as "demeaning" and vaguely recalled uttering the word "bitches."

When her flashback subsided, Trahan messaged her manager, Joseline Belanger, insisting that she wanted to move to her permanent assignment as soon as possible.[1]  Ireland reported the altercation with Trahan to her manager, Haley Mannion.  Belanger and Mannion approached a third manager, Kristie Foster, who brought the situation to the attention of the site manager, Peter Boudreaux.  Boudreaux ordered Foster to investigate.

---

[1]  Trahan variously refers to "permanent assignment," "permanent desk," and "permanent team."  She apparently uses these terms interchangeably to describe the same request.  We follow her lead.

Foster and Mannion met with Ireland and obtained her version of the altercation. Thereafter, Foster and Belanger met with Trahan and told her that they were investigating what had happened on the floor. Trahan said that Ireland had "snapped at her" but did not elaborate. Trahan added that she was "sick of the 'clique,'" which she claimed was "always talking about her" and was composed of a "bunch of bitches." Trahan reiterated her desire to move to a different desk or a different team in order to minimize her interactions with Ireland.

During this meeting, Trahan appeared physically closed off: she crossed her arms, faced the wall, and rolled her eyes repeatedly. Foster gauged this behavior to be rude and unprofessional. Trahan later testified that she was in the midst of a panic attack, and her behavior was the result of learned coping mechanisms. Even so, she did not indicate to the managers either that she had a disability or that it was then manifesting itself. After the meeting, Trahan had another flashback while seated in her car.

Foster and Mannion next met with McDonald, who largely confirmed Ireland's account. Foster continued on, interviewing Noddin and the floorwalker who had skirmished with Trahan earlier that month. Later that day, the human resources manager (Jonie Dunivan) returned after a brief absence from the workplace and took charge of the investigation.

Dunivan, accompanied by Foster and Belanger, met with Trahan and informed her that she was suspended until September 22, pending further investigation. During this conversation, Trahan again referred to her co-workers as "bitches." Trahan says that she felt attacked and outnumbered and found Dunivan "snappy and snarky." Foster retrieved Trahan's personal effects from Trahan's workstation before escorting her out of the call center. Shortly thereafter, Trahan texted an uninvolved co-worker, indicating that she had called Ireland a "little bitch" and representing that she anticipated "get[ting] shafted because of this whole thing."

Dunivan continued her investigation. Late that afternoon, she and Boudreaux concluded that Trahan's employment should be terminated. Even by Trahan's own description of events, she had violated the Conduct Rules, which require employees to "treat everyone in a professional manner — that is, with respect, integrity, courtesy and a cooperative attitude." In addition, Dunivan gave weight to Trahan's "pattern of unprofessionalism and rudeness." It was agreed that Dunivan would contact Trahan the following day to fire her. Up to this point, no one had described the altercation as a manifestation of a PTSD episode.

Dunivan departed from the office at around 5 p.m. that evening. Approximately half an hour later, Trahan left her a voicemail. In the voicemail, Trahan stated: "I forgot to tell you today that the reason I did ask for that transfer . . . out of

that situation is because I am a veteran with severe PTSD and how those girls were treating me was causing triggers to come out in me." She offered to provide documentation of these facts.

The first time that Dunivan learned of Trahan's PTSD was when she retrieved the voicemail on September 21. Dunivan returned Trahan's call that afternoon. She expressed skepticism that the incident could have triggered a PTSD flashback, questioned the extent of Trahan's disability, and requested access to Trahan's medical records. Dunivan tried to impress upon Trahan that the incident was "very serious." When Trahan asked whether she was being fired, Dunivan equivocated and told her instead that the investigation remained open.

In the same conversation, Trahan asked to be moved away from Ireland and McDonald. Although Dunivan understood this request to be linked to Trahan's disability, she did not understand it to be a request for an accommodation. Although Dunivan does not recall it, Trahan says that she also mentioned the possibility of working from home.

Dunivan next called her supervisor to "confirm[] [she] had . . . support to proceed with the termination." The following day, she called Trahan and discharged her. No one else was disciplined with respect to the incident.

In due season, Trahan repaired to the federal district court and sued Wayfair for disability discrimination under the

Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213, and the Maine Human Rights Act, Me. Stat. tit. 5, §§ 4551-4634. She claimed that she was wrongfully discharged based on her PTSD, and that Wayfair used her violation of its Conduct Rules as a pretext for cashiering her. Trahan also claimed that Wayfair failed to accommodate her disability, as required by law.

Following a period of pretrial discovery, Wayfair moved for summary judgment. Trahan opposed the motion, but the district court granted it. See Trahan v. Wayfair Me., LLC, No. 1:18-cv-00209-LEW, 2019 WL 4246678, at *5 (D. Me. Sept. 6, 2019). Trahan responded by filing a timely notice of appeal. In her briefing, Trahan challenges only the entry of summary judgment on her ADA claims. Consequently, we do not discuss the district court's entry of summary judgment on her state-law claims.

## II. ANALYSIS

We review a district court's entry of summary judgment de novo, viewing the facts in the light most congenial to the nonmovant and drawing all reasonable inferences to that party's behoof. See Potvin v. Speedway LLC, 891 F.3d 410, 413-14 (1st Cir. 2018). We will affirm only when the record demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Summers v. City of Fitchburg, 940 F.3d 133, 137 (1st Cir. 2019). A plaintiff opposing a properly documented summary

- 9 -

judgment motion must carry "the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe." Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011) (quoting Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003)).

With this foundation in place, we turn to Trahan's assignments of error. First, though, we set out the analytic framework that governs her claims. We then move to Trahan's contention that the district court erred in entering summary judgment against her on her claim of discriminatory discharge. Finally, we examine Trahan's contention that the district court erred in entering summary judgment against her on her failure-to-accommodate claim.

## A. The Analytic Framework.

We begin with bedrock. "Congress enacted the ADA 'to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'" Gray v. Cummings, 917 F.3d 1, 14 (1st Cir. 2019) (quoting 42 U.S.C. § 12101(b)(1)). Under the ADA, a covered employer — such as Wayfair — is forbidden from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA defines discrimination on the basis of

- 10 -

disability to include "limiting, segregating, or classifying a[n] . . . employee in a way that adversely affects the opportunities or status of such . . . employee because of" her disability. Id. § 12112(b)(1). For this purpose, an adverse employment action includes both discharging an employee, see 29 C.F.R. § 1630.4(a)(1)(ii), and failing to make reasonable accommodations for an employee's disability, see US Airways, Inc. v. Barnett, 535 U.S. 391, 396 (2002) (citing 42 U.S.C. § 12112(b)(5)(A)).

In this case, the familiar McDonnell Douglas framework is in play. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973); Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 264 (1st Cir. 1999). Under that framework, the employee bears the burden of making out a prima facie case of discrimination. See Miceli v. JetBlue Airways Corp., 914 F.3d 73, 81 (1st Cir. 2019). If the employee clears this low hurdle, a rebuttable presumption of discrimination arises, and the burden shifts to the employer to advance a legitimate, nondiscriminatory reason for its actions. See Mancini v. City of Providence, 909 F.3d 32, 39 (1st Cir. 2018). This is merely a burden of production; the burden of persuasion remains throughout with the employee. See Miceli, 914 F.3d at 81-82. So long as the employer satisfies its second-stage burden by proffering a non-discriminatory reason for the adverse employment action, the employee — at the third stage of the analysis — must show that the employer acted not for

the stated reason but, rather, because of the plaintiff's disability.  See id.

## B. Discriminatory Discharge.

Against this backdrop, we turn to Trahan's claim of discriminatory discharge.  In this vein, Trahan asserts that she raised a genuine issue of material fact as to whether Wayfair discriminated against her by terminating her employment on the basis of her disability.  Wayfair responds that it decided to terminate Trahan's employment based on her breach of the Conduct Rules before it learned of her PTSD; that regardless of when it learned about Trahan's PTSD, Trahan nonetheless failed to make out a prima facie case sufficient to satisfy her burden at the first stage of the McDonnell Douglas framework; and that, at any rate, Trahan's misconduct justified her dismissal notwithstanding her disability.

Each of Wayfair's three lines of defense is colorable, but we have no need to analyze them all.  We start — and finish — with the third line of defense, taking no view as to the merits of Wayfair's other lines of defense.

In undertaking this inquiry, we go directly to the third stage of the McDonnell Douglas framework.  We assume, favorably to Trahan, that she satisfied her first-stage burden by making out a prima facie case of discriminatory discharge.  She is, therefore, entitled to the benefit of "a presumption of discrimination."

- 12 -

Gillen v. Fallon Ambul. Serv., Inc., 283 F.3d 11, 30 (1st Cir. 2002). So, too, the second stage of the McDonnell Douglas framework is not in issue: Trahan readily acknowledges that Wayfair satisfied its second-stage burden by articulating a nondiscriminatory reason for her discharge (that the company was simply enforcing its Conduct Rules). See Raytheon Co. v. Hernandez, 540 U.S. 44, 53 (2003) (explaining that "proffer of . . . neutral . . . policy plainly satisfie[s]" employer's obligation at second stage of McDonnell Douglas inquiry); Miceli, 914 F.3d at 82 (determining that employer satisfied second-stage burden of production by alleging "that it terminated the appellant's employment in accordance with its clearly delineated and neutrally applied corporate policy").

Focusing on the third stage of the McDonnell Douglas framework — whether Wayfair acted with discriminatory intent — the record reveals that Trahan's misconduct was patent. Trahan admits that she called two of her co-workers (Ireland and McDonald) "bitches." To compound the matter, she repeated in her subsequent meeting with management that they were a "bunch of bitches." What is more, her other actions — such as rolling her eyes, throwing her headset, and slamming down her phone — were undisputed and plainly warranted Wayfair's determination that Trahan had acted unprofessionally.

- 13 -

It cannot be gainsaid that acting unprofessionally and in a disrespectful manner transgressed the Conduct Rules. In short, Trahan committed fireable misconduct, and Wayfair must prevail at the third stage of the McDonnell Douglas framework unless Trahan — who adduced no direct evidence that Wayfair acted with an intent to discriminate on the basis of her disability — can show that Wayfair's ostensible reliance on this misconduct as the predicate for her dismissal was a sham, that is, a pretext for discrimination. See Raytheon Co., 540 U.S. at 51-52; Gillen, 283 F.3d at 30 n.11.

Trahan tries to travel down this road. She mounts a claim of pretext and asserts that she was disciplined differently than nondisabled employees. To this end, she submits that her misconduct was punished more severely than that of comparable Wayfair employees. In other words, Wayfair was not enforcing the Conduct Rules uniformly.

The record belies Trahan's assertion of pretext. To begin, Trahan admits that she was not the only call center employee discharged "due to unprofessional interactions with coworkers" and that "no employee . . . received discipline short of termination due to an emotional outburst or fit of anger" in the workplace. Thus, Trahan's assertion of a lack of disciplinary uniformity hinges on her contention that she was "treated differently than non-disabled co-workers who arguably violated" the Conduct Rules

- 14 -

in other (analogous) ways.  This contention does not withstand scrutiny.

In support of her contention, Trahan alleges that Wayfair did not discipline employees "for using the company chat system to make fun of others," for making her feel uncomfortable, and for using profanity on the sales floor.  She also alleges that, in the aftermath of the September 20 incident, Wayfair did not discipline Ireland for "snapp[ing]" at her.  As we explain below, Trahan is comparing plums to pomegranates.

"'Reasonableness is the touchstone' when considering comparators in a disparate treatment case; that is, 'while the plaintiff's case and the comparison cases that [s]he advances need not be perfect replicas, they must closely resemble one another in respect to relevant facts and circumstances.'"  Ray v. Ropes & Gray LLP, 799 F.3d 99, 114 (1st Cir. 2015) (quoting Conward v. Cambridge Sch. Comm., 171 F.3d 12, 20 (1st Cir. 1999)).  It follows that an employee claiming differential treatment must show that those with whom she seeks to be compared "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751 (1st Cir. 1996) (quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)).

Here, the most closely analogous instances do not advance Trahan's cause. It is uncontroverted that Wayfair fired other employees when it learned that they had indulged in emotional outbursts in the workplace or given vent to fits of anger there.

Trahan tries to make an end run around these comparators by pointing to other types of behavior. She says that some employees freely used the chat system to make fun of people,[2] got away with exhibiting snappiness, and used profanity on the sales floor without facing disciplinary consequences. These situations, however, are not fairly comparable to the misconduct that Trahan committed.

With respect to the chat system, Trahan stated that she "saw [her] name" (but no other words) and believed the chat was making fun of her. As a result of the chat and other behavior that she attributed to what she termed the "clique" — a reference to Ireland, McDonald, and their friends — she felt "uncomfortable." But Trahan offers nothing in the way of a factual basis to support her belief that the chat made fun of her. Speculation is no substitute for proof. See Lang v. Wal-Mart Stores E., L.P., 813 F.3d 447, 460 (1st Cir. 2016). It follows that speculation unsupported by facts is manifestly inadequate to stave off summary

---

[2] For what it may be worth, Wayfair was not oblivious to possible misuse of the chat system. The record shows that a Wayfair floorwalker addressed appropriate use of the chat system at a meeting held shortly after the chat to which Trahan adverts.

judgment. See id. (explaining that "a party cannot ward off summary judgment with 'proffers that depend . . . "on arrant speculation, optimistic surmise, or farfetched inference"'" (alteration in original) (quoting Fragoso v. Lopez, 991 F.2d 878, 887 (1st Cir. 1993))).

To cinch the matter, the alleged chat-room abuse is totally unproven; Trahan offers no particulars concerning what offending words may have been said. On this sparse record, the alleged chat-room hijinks are not fairly comparable to Trahan's misconduct. Making colleagues feel uncomfortable is far from ideal, but the conduct that makes a colleague experience discomfort may or may not be unprofessional. Much depends both on idiosyncratic circumstances and on subjective feelings, and Trahan describes no specific misconduct that is on par with her own.

Next, Trahan seeks to compare Ireland's snapping at her on September 20 with Trahan's own misconduct. She complains that Ireland was not punished, let alone fired, for this behavior. What she leaves out, however, is that (even on Trahan's own telling) Ireland neither swore at anyone nor engaged in unprofessional behavior over and beyond her snapping. Although Dunivan acknowledged in the abstract that one co-worker snapping at another would be inappropriate workplace behavior, snapping at someone is not on all fours with cursing co-workers in the throes of a heated encounter. An employer's response to employee conduct that is

"different in kind" cannot form the basis for an inference of pretext.  Ramos-Santiago v. WHM Carib, LLC, 919 F.3d 66, 74 (1st Cir. 2019).

As a final riposte, Trahan suggests that many of her peers "would swear on the floor" yet were not disciplined.  But nothing about this amorphous suggestion undermines Wayfair's statement that it "has zero tolerance for co-workers directing curse words toward peers or customers in any type of aggressive manner."  Trahan has not pointed to any facts in the record that call Wayfair's "zero tolerance" policy into question.  And merely uttering profane expressions on the sales floor without directing the profanity at any particular individual is inherently different from directing epithets at co-workers.  The former, while not to be encouraged, simply does not sink to the level of the latter.  Swearing at someone and swearing in general are distinct enough phenomena to be treated disparately.  See Perkins, 78 F.3d at 751.

The bottom line is that Trahan's so-called comparator evidence is insufficient to show that any of the situations about which she complains "closely resemble[d]" the misconduct for which she was fired.  Ray, 799 F.3d at 114 (quoting Conward, 171 F.3d at 20).  The critical difference is that Trahan's misconduct was far more blameworthy than that of any co-worker she identified.  Trahan called her co-workers "bitches" in the course of a turbulent workplace incident that involved throwing and slamming things.

Moreover, she doubled down on the epithet during a later meeting with management. Given these qualitative distinctions, her attempted comparisons are unreasonable, and, thus, fail to create a genuine issue of material fact. See Conward, 171 F.3d at 20-22; Perkins, 78 F.3d at 751.

In a last-ditch effort to salvage her pretext argument, Trahan says that Dunivan's harsh questioning regarding her PTSD demonstrates that Wayfair acted with discriminatory intent. The very case Trahan cites for this proposition, though, undermines her effort. See Kelley v. Corr. Med. Servs., Inc., 707 F.3d 108, 116-17 (1st Cir. 2013). In Kelley, we concluded that an employee presented evidence sufficient to support a "reasonable inference" of discriminatory animus when the employee and supervisor had a months-long "history of disability-based conflict." Id. at 111-12, 116-17. Kelley stands in stark contrast to the case at hand. Here, Dunivan and Trahan had only one conversation in which Dunivan questioned Trahan's disability — a conversation that occurred on the very same day that Dunivan first learned of it. Both the timing and the solitary nature of the conversation here readily distinguish this case from Kelley, especially since "there is little to no evidence suggesting that" Trahan's firing was based on "an unlawful motive." Id. at 117. After all, the "ADA is not a license for insubordination at the workplace," Reed v. LePage Bakeries, Inc., 244 F.3d 254, 262 (1st Cir. 2001), and Trahan's

- 19 -

emotional outburst on September 20 plainly demonstrated her breach of Wayfair's Conduct Rules.

Nothing more need be said. On this record, no reasonable factfinder could conclude that Wayfair's stated reason for discharging Trahan was pretextual. Consequently, the district court did not err in entering summary judgment against Trahan on her discriminatory discharge claim.

## C. **Failure to Accommodate.**

Trahan's remaining claim is that Wayfair discriminated against her by not accommodating her PTSD. She posits that Wayfair failed to accommodate her disability in two specific ways: not moving her desk assignment and not permitting her to work from home. Trahan adds that, with an accommodation, she could have performed the essential functions of her job as a sales and service consultant.

The district court ruled that Trahan's communications with her employer were not "request[s] for a workplace accommodation" because, even if granted, they would not "make [Trahan] more capable of" fulfilling her duties as a sales and service consultant. Trahan, 2019 WL 4246678, at *3-4. In the court's view, Trahan's accommodation requests amounted to no more than "an excuse for her past transgression." Id. at *4. We examine this ruling through the statutory prism.

The ADA provides that unlawful discrimination includes an employer "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified" employee. US Airways, Inc., 535 U.S. at 396 (emphasis in original) (quoting 42 U.S.C. § 12112(b)(5)(A)). Thus, to survive summary judgment on a failure-to-accommodate claim, an employee must furnish evidence that she was disabled within the meaning of the ADA; that she was a qualified individual; and that her employer knew about her disability yet neglected to accommodate it. See Pena v. Honeywell Int'l, Inc., 923 F.3d 18, 31 (1st Cir. 2019); Higgins, 194 F.3d at 264.

In the case at hand, the first element is not in dispute. The parties stipulated that Trahan suffers from PTSD, and Wayfair concedes that she was disabled within the meaning of the ADA by reason of her PTSD.

Like the first element, the second element need not detain us. We assume, for argument's sake, that Trahan established that she was a qualified individual and, therefore, satisfied her burden with respect to the second element. So, too, we assume arguendo that Wayfair knew of Trahan's disability when she made what she characterizes as her accommodation requests.[3] With these

---

[3] The parties expend considerable energy discussing which individual at Wayfair had to have knowledge of Trahan's PTSD and when such knowledge was acquired (relative to the date when the adverse employment decision was made and the date when that

- 21 -

assumptions in place, all that remains is to determine whether Trahan's proposals constituted reasonable accommodation requests.

A reasonable accommodation is a change in workplace conditions that would enable an employee to perform the essential functions of her job. See 29 C.F.R. § 1630.2(o)(1)(ii). Such an accommodation, though, must be feasible for the employer. See Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 90 (1st Cir. 2012); Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 23 (1st Cir. 2004). Typically, reasonable accommodations include such things as job restructuring, modified work schedules, reassignment to vacant positions, and the like. See 42 U.S.C. § 12111(9)(B); Calero-Cerezo, 355 F.3d at 23. The reasonableness of any proposed accommodation, including its feasibility, must be assessed on a case-by-case basis. See Calero-Cerezo, 355 F.3d at 23.

Even though reasonableness necessarily depends on the circumstances of a given case, some general principles apply. For instance, "[a] requested accommodation that simply excuses past misconduct is unreasonable as a matter of law." McElwee v. County of Orange, 700 F.3d 635, 641 (2d Cir. 2012). After all, the ADA does not oblige an employer to accommodate an employee's disability retroactively. See DeWitt v. Sw. Bell Tel. Co., 845 F.3d 1299, 1316 (10th Cir. 2017) (explaining that overlooking past misconduct

decision was effectuated). For simplicity's sake, we bypass this quagmire and give Trahan the benefit of the doubt.

is not within the realm of reasonable accommodations); Schaffhauser v. UPS, Inc., 794 F.3d 899, 902, 906 (8th Cir. 2015) (upholding rejection of accommodation request made after employee's racist comment). In this case, Trahan made both of the proposals that she seeks to classify as accommodation requests after committing the fireable misconduct that prompted her discharge. Where, as here, an accommodation request follows fireable misconduct, it ordinarily should not be viewed as an accommodation proposal at all. See Jones, 696 F.3d at 90 (stating that "[w]hen an employee requests an accommodation for the first time only after it becomes clear that an adverse employment action is imminent, such a request can be 'too little, too late'" (quoting Reed, 244 F.3d at 262 n.9)); see also U.S. Equal Emp. Opportunity Comm'n, EEOC-CVG-2003-1, Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act 36 (2002) ("Since reasonable accommodation is always prospective, an employer is not required to excuse past misconduct even if it is the result of the individual's disability."). Such a request is better understood as a plea either for forgiveness or for a second chance. See DeWitt, 845 F.3d at 1316 (concluding that "excusing workplace misconduct to provide a fresh start/second chance to an employee whose disability could be offered as an after-the-fact excuse is not a required accommodation under the ADA" (emphasis in original) (quoting

- 23 -

Davila v. Qwest Corp., 113 F. App'x 849, 854 (10th Cir. 2004)));

Hill v. Kan. City Area Transp. Auth., 181 F.3d 891, 894 (8th Cir. 1999) (explaining that employee who made after-the-fact request was not seeking accommodation but, rather, seeking "a second chance to better control her treatable medical condition").

Here, Trahan — like the plaintiff in Jones — made the request for a seat reassignment in a conversation with Dunivan "only after it bec[ame] clear that an adverse employment action [was] imminent."[4] 696 F.3d at 90. By the same token, she first mentioned the possibility of working from home after she had been suspended. Given the timing of the requests, implementing them would have required forgiveness of her fireable misconduct and a fresh start at Wayfair. Nothing in the ADA demands that an employer accord an employee — even an employee with a disability — such a second chance. See DeWitt, 845 F.3d at 1316.

In all events, Trahan's requested accommodations were not reasonable. For this purpose, reasonableness requires, among other things, that the employee demonstrate that her proposal would be effective to allow her to perform the essential functions of her job. See, e.g., Jones, 696 F.3d at 90 ("One element in the

_____

[4] Messages that Trahan sent to an uninvolved co-worker during the afternoon of September 20 indicated that she was already aware of the potential severity of the consequences of her outburst. Her messages stated that she was "pretty sure [she was] going to get shafted because of this whole thing" and that she was "probably going to get in trouble."

reasonableness equation is the likelihood of success." (quoting Evans v. Fed. Express Corp., 133 F.3d 137, 140 (1st Cir. 1998))). Neither of Trahan's proposals clears this bar.

First, nothing about the request to move to a permanent desk or team away from Ireland and McDonald inspired confidence in Trahan's ability to comport herself in accordance with Wayfair's Conduct Rules. Trahan admits that sales and service consultants "work collaboratively insofar as they frequently interact with each other about their work and rely upon each other" for assistance and information. She further admits that consultants "work on teams and work closely together in team meetings, group coaching sessions, and trainings." Seen in this light, it is apparent that the requested team-reassignment accommodation lacks feasibility.

Trahan's triggers were diverse and unpredictable, and commonly included the feeling of "losing control" and of "being ganged up on." Given the nature of these triggers, there is no grounding for a reasonable inference that joining a different team in a different space would have enabled Trahan to behave more collaboratively or professionally. Teams, by their nature, require members to cede some control, and people, by their nature, do not always agree. Thus, Trahan cannot support her assertion that she could have fulfilled her duties as a Wayfair sales and service consultant on any other team, as she still would have had

to work collaboratively with others who could trigger her at any time.

Nor was working from home a reasonable accommodation. Undisputed record evidence shows that at the time Trahan was cashiered, Wayfair did not offer work from home opportunities in Maine because it lacked the technological capabilities to support such an arrangement. Trahan acknowledges this reality but rejoins that she learned during training that Wayfair was in the process of developing a work-from-home program. She adds that Wayfair began offering such opportunities "the month after" she was discharged.

As we have said, determinations of reasonableness in this context must be made on a case-by-case basis. See Calero-Cerezo, 355 F.3d at 23. At the relevant time, Wayfair did not employ sales and service consultants working from home. Wayfair was not required, as part of a reasonable accommodation, to hold Trahan's request in abeyance and let her remain in place pending the availability of a work-from-home program. It follows inexorably that this proposed accommodation was not reasonable in September of 2017 — the month in which the accommodation was requested and in which Trahan's employment was terminated.

At the expense of carting coal to Newcastle, we add that Trahan has not explained how her work-from-home proposal would have equipped her to follow Wayfair's Conduct Rules. Trahan

offered no evidence, beyond her own assertion, to satisfy her burden of establishing that working from home would have enabled her to perform her job in accordance with Wayfair's reasonable expectations. As said, some of Trahan's PTSD triggers were inherently unpredictable and could occur anywhere. Although working from home may have involved fewer interactions with co-workers, it would not have eliminated those interactions entirely; Trahan still would have been a member of a larger sales and service organization and subject to supervision. Her PTSD triggers were likely to reappear in Wayfair's team-oriented environment whether Trahan was working from the call center or from her own residence. And despite the absence of problems with customers during the handful of weeks that she worked for Wayfair, Trahan — whose disability manifested itself (at least in part) by a difficulty in perceiving reality — gave the company no reason to believe that she could proceed professionally if a customer's call triggered her PTSD.

Trahan has one last shot in her sling. She asseverates that any record deficiencies regarding the reasonableness of her proposed accommodations are "due to Wayfair's failure to engage in an interactive process." Refined to bare essence, she submits that Wayfair opted to fire her rather than engage in a discussion.

We agree that a request for an accommodation may spark an employer's duty to engage in an interactive dialogue with a

disabled employee.  See id.  But liability for failure to engage in an interactive process depends on a finding that the parties could have discovered and implemented a reasonable accommodation through good faith efforts.  See Jones, 696 F.3d at 91.  Here, however, the record contains no evidence sufficient to ground a reasonable inference that further dialogue between Trahan and Wayfair was likely to have led to such an outcome.  Her attempt to invoke the interactive process is, therefore, futile.  See id.

That ends this aspect of the matter.  We discern no error in the district court's entry of summary judgment for Wayfair on Trahan's failure-to-accommodate claim.

## III. CONCLUSION

We need go no further.  For the reasons elucidated above, the judgment of the district court is

**Affirmed.**