IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| MICHAEL ALLEY, M.D.,<br><br>              Appellant,<br><br>     v.<br><br>THE UNIVERSITY OF WASHINGTON,<br>an agency of the State of Washington,<br><br>              Respondent. | No. 87618-0-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

COBURN, J. — After repeated failures in meeting performance expectations, the University of Washington (UW) dismissed Michael Alley from its five-year-long orthopaedic surgery residency program near the end of his second year. Alley sued the UW, alleging violations of the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW. Alley argued that the UW failed to accommodate his disabilities, terminated his residency because of his disabilities, and did not renew his residency in retaliation for seeking disability accommodation. The trial court granted summary judgment in favor of the UW after concluding that Alley failed to establish a prima facie case for a failure to reasonably accommodate and that he failed to establish that the UW's nondiscriminatory basis for his dismissal was pretextual or was substantially motivated by a discriminatory factor. We affirm.

FACTS

After graduating medical school, Alley entered the UW Orthopaedic Surgery Residency Program in July 2019. At that time Alley was taking prescribed medications for recurrent major depressive disorder and attention deficit hyperactivity disorder. He reported to his primary care physician in June 2019 that his depression was "under control" but that it could be improved. His doctor prescribed a new medication but noted that his depressive disorder was in remission. The following month, in July 2019, Alley's doctor adjusted his medications to treat his "shift work sleep disorder."

As part of the UW's residency program residents sign one-year agreements with the UW, which must be renewed annually to remain in the five-year program. Alley completed the first year of his residency and was renewed for a second year. As a resident, Alley was supervised by residency program director Dr. Christopher Kweon, who oversaw all orthopaedic surgery residents and gathered feedback from other supervising doctors to assess residents' individual progress in the program and their employment status at the UW.

Alley began the second year of his residency in July 2020 that consisted of eight clinical rotations, including three trauma clinic rotations supervised by attending physicians at Harborview Medical Center. In August Alley started his first trauma rotation. Within two weeks, Kweon received feedback from associate residency program director Dr. Lisa Taitsman that Alley was "struggling" and was "way below his peer[s]" in his performance at weekly fracture conferences where residents present on cases from the previous week to supervising surgeons. Supervising attending physician Dr. Robert Dunbar described Alley's performance at fracture conferences as "the weakest in as

long as I can remember." Dunbar also described an instance where he asked Alley "almost an embarrassingly easy question" that Alley could not answer. Concerns also were raised regarding Alley's clinical performance.

The following month Alley received a "Patient Safety Network" (PSN) complaint that he performed a procedure on a patient without first administering anesthesia. According to Alley's later testimony, PSN complaints can be prepared and submitted by any Harborview hospital staff about any issue that the complainant considers a threat to patient safety.

Supervising attending physician Dr. Michael Githens told Alley in a meeting in late September that if he continued to fall behind at the same rate, he would pose an unsafe threat to patients "because he's not going to know what he's doing or why" and "if there are things going on in his life outside of work that are interfering with his development, whether family related, health related, addiction, or anything else, that it was, one, critical that he acknowledges this, and, two, seek help." Internal quotation marks omitted. Alley responded that he had no issues and just needed more time to find a study plan that worked for him. Alley thought he was performing satisfactorily in his first trauma rotation and that he was improving. Githens felt that Alley lacked insight into his poor performance and "seemed a bit angry at times and defensive of his position, rather than acknowledging weaknesses."

Concerns regarding Alley's patient care, medical knowledge, and professionalism resulted in the UW deciding to issue a "Focus of Concern" (FOC) letter. Kweon informed Alley in September that he was going to be receiving the FOC letter. Around the same time, Alley met with Kweon in person and disclosed his recurrent major depressive

disorder. Alley told Kweon that it was "a possibility" that his depression may be affecting his ability to perform his job.

UW issued its FOC letter on October 19. The letter mentioned performance issues, including the complaint from September that Alley received regarding performing a patient procedure without first administering anesthesia. In the letter, Kweon listed action items that Alley was required to complete to get his performance back on track. Kweon advised Alley that failure to perform satisfactorily in the identified areas would result in disciplinary action up to and including dismissal, including performance at a level appropriate in terms of medical knowledge and patient care and consistently demonstrating behavior that is in line with department and school of medicine standards regarding professionalism, teamwork, and communication. The FOC letter also advised Alley:

> If you believe that a medical condition is affecting your ability to perform your job, you may want to begin the accommodation request process by contacting the [UW] Disability Services Office [(DSO)] (https://hr.uw.edu/dso/). You are not required to disclose the medical need for an accommodation to us.

The DSO is an arm of the UW's human resources department that receives and analyzes disability accommodation requests and health care provider documentation for potential accommodation. According to an apparent UW human resources publication about disability accommodation for employees, if employees believe that a medical condition is affecting their ability to perform their job, they "may want to begin the accommodation request process by discussing your needs with your supervisor, contacting your HR consultant or contacting DSO." When employees reach out to their supervisor about accommodations, supervisors are instructed to direct them to the

4

DSO. The employee completes an application form explaining what accommodation they are requesting and submits it with supportive medical documentation for the DSO's review. After that review, the UW's Graduate Medicine Education Office, which oversees all residency programs at the UW and keeps records of all residents and their performance in their residency program, engages in an interactive process with residents and their programs to determine if there can be reasonable accommodations made. The residency program implements an accommodation only after the DSO has vetted the accommodation and the accommodation is determined as reasonable.

At the time he received the FOC letter, Alley agreed that his performance at fracture conferences and sign-outs could improve but believed he was satisfactorily performing his duties as a second-year orthopaedic surgery resident. Alley did not contact DSO at this time. He later testified, "I wasn't sure at all about requesting accommodations or what that might even mean at that time. To me, I needed to dig in and work harder."

Concerns regarding Alley's performance continued in November, including issues with tardiness and not showing up for the first case of the day or being present in the operating room. Though Alley later testified that his work shift sleep disorder caused his tardiness due to related sleep deprivation, Alley did not tell anyone about his work shift sleep disorder at this time because he "was unsure if that was really what was going on."

At the end of November, during Alley's second trauma rotation, Dr. Kweon met with Alley to discuss concerns that chief resident Jackie Dunahoe received from other residents that Alley was not acting like himself, had bloodshot eyes, appeared to be

diaphoretic, and that he might be suffering from a substance abuse problem. Alley insisted he was not having substance abuse issues and was not otherwise impaired.

In early December Kweon and orthopaedic surgery and sports medicine department chair Dr. Howard Chansky, who oversees the orthopaedics and sports medicine department at the UW,[1] referred Alley to the Washington Physician's Health Program (WPHP). The WPHP is a third-party non-profit business that evaluates physicians for "impairment," defined as "the inability to practice with reasonable skill and safety"[2] that "can be due to any physical or mental condition," for any reason, including substance abuse or mental health issues.

The UW School of Medicine's Physician Impairment Policy requires residents exhibiting evidence of impairment to be referred to the WPHP for evaluation, treatment, and monitoring. The WPHP is solely authorized to determine whether the resident is fit for duty and to endorse the resident's return to work, training, and clinical care responsibilities. The WPHP conducts a standardized global assessment for any potentially impairing health conditions and makes referral recommendations to outside evaluators for treatment recommendations.

In late December supervising attending physicians Dr. Daphne Beingessner and Dr. David Barei determined that Alley was extremely behind his peers and lacked insight into his need for improvement. Feedback included that Alley did not know basic ankle anatomy on an x-ray.

---

[1] As part of this role, Chansky is responsible for both the residency program and the department and supervises the residency program director.

[2] Internal quotation marks omitted.

After he failed to attend a mandatory WPHP intake appointment on December 31, Alley was suspended from clinical and patient care activities pending the WPHP's endorsement of his return to work. Alley began working with the WPHP in January 2021.

By January 2021, Alley knew that his disabilities were negatively impacting his job performance. On January 20, 2021, Alley emailed Bree Callahan, Americans with Disabilities Act[3] (ADA) coordinator with the UW, regarding "grave concerns" he had about "[r]equesting accommodations without receiving them." Alley then spoke with Callahan and asked her for help with requesting accommodations. Callahan referred Alley to the UW's University Complaint Investigation and Resolution Office (UCIRO) and the DSO to help with any accommodation needed when he was allowed to return to work.

Alley concedes that before he had reached out to Callahan, he had not requested accommodations from the UW. Instead, Alley relied on the WPHP, who, according to Alley, told him that "they would be the intermediate to go between myself and the [UW] for any accommodations if they decided I needed them." Alley said that "[a]fter nearly several weeks of drug testing and negative drug tests," he asked WPHP to go to the UW on his behalf to request accommodations for his disabilities. Alley testified that the WPHP responded by informing him that they were "going to continue to investigate [him]." Alley said he did not send his medical records and make accommodation requests to the DSO on his own "because I wouldn't have been in

---

[3] See 42 U.S.C. § 12101 et seq.

compliance with the WPHP." He testified that multiple individuals with the WPHP told him he could not unilaterally make accommodation requests to the UW or its DSO.

On January 22, 2021, Alley spoke with Gretchen Bennett from the DSO. Alley expressed concerns that the WPHP "was not providing requests for accommodations" for him and sought assistance from the DSO to facilitate the request process. Bennett shared information with Alley about the accommodation process and emailed him forms to start the process. Bennett sent an email to Alley on January 22 stating:

> Per our conversation, I have attached the forms that are needed to start the accommodation process.
> 1.     DAR (Disability Accommodation Request) – is completed by the employee and should not have any medical information included.
> 2.     HCP (Healthcare Provider Statement) – first page is completed by the employee and the remainder is completed by the provider. This is the medical support for the requested accommodation.
> Once this information is recieved [sic], it will be analyzed for reasonable accommodation options.
> You are welcome to review our website (see link below) which has basic information related to requesting an accommodation and the process thereafter.
>
> …
>
> Visit us online at: https://www.washington.edu/admin/dso/index.html

Alley did not complete any of the forms or submit any request to the DSO for accommodations. Alley testified that he did not complete the forms because, according to Alley, Laura Moss with the WPHP told him that "any forms for accommodations had to be provided through WPHP to be in compliance with them." However, Alley could not recall whether Moss told him this before or after he spoke with Bennett on January 22. Alley also could not recall whether he told the WPHP that he had connected with the DSO. Alley otherwise acknowledged that this January 22 meeting with the DSO

presented an opportunity for him to request reasonable accommodation and to initiate

the interactive accommodation process, which he did not do. When asked why he did

not follow up with Bennett or anyone else at the DSO to request accommodations, Alley

testified:

> The information they provided me … was not helpful, and I had outlined that to [Bennett] in that first phone call that that simply was not going to help just having the forms. … Because the WPHP was not willing to fill out those forms at the time or allow their chosen physicians that … were working with … me to conduct those at that time.

On February 12 the WPHP concluded Dr. Alley did not have any impairment that

would prevent him from practicing medicine with reasonable skill and safety[4] and

endorsed him to return to work conditioned on its continued monitoring. Upon the

WPHP's endorsement, Alley joined his spine rotation.

At this time Alley considered himself "fit for duty" and thought he could perform

duties satisfactorily.[5] Alley claims he discussed proposed accommodations with Kweon

in February 2021, but he informed an investigator with the UCIRO that he did not end

up requesting accommodations because "he was rushed back into rotation under the

WPHP contract and … [his spine rotation] was going well, so [he] did not end up making

the request."

In March 2021 the UW received a complaint from a patient regarding Alley's care

and behavior. Alley was late on his second day of his third and final trauma rotation that

began on March 29. In early April a chief resident expressed concern regarding Alley's

improper performance of a knee procedure, his inability to take feedback, and

---

[4] As reported in the WPHP's quarterly reports, this assessment of Alley did not change during his residency.

[5] Alley later testified that he was satisfactorily performing the duties of his job at all times.

insistence that he was correct. Dr. Beingessner described the incident as another example of Alley's "serious attitude problem" and expressed concern that the chief residents "feel they need to basically stay up all night in order to re-check all the work that [Alley] has done."

On April 21 supervising attending physicians met with Alley and informed him that he needed to show improvement in the identified areas by the end of the rotation to be at a level appropriate for advancement, which Alley did not agree with. That same day medical records show that Alley told his psychiatrist that he was "[i]nterested in pursuing accommodations." The psychiatrist, according to the April 21 visit note, told Alley "to contact disability services at his school to start this process."

On April 23 Alley was late for work again and sent an email to his supervising attending physician Dr. Jonah Davies apologizing and stating that he had a health issue that he was working on addressing. Alley informed Kweon that his shift work sleep disorder was affecting his trauma rotation performance. Kweon reminded Alley about the DSO process for requesting accommodations and asked him what accommodations might be helpful. Alley asked for consideration of a schedule change to accommodate his work shift sleep disorder and discussed with Kweon that he could sleep at the hospital in the meantime to get assistance waking up until accommodations could be put in place. Alley and Kweon agreed at this time that Alley would speak with his providers about possible accommodations and Alley told Kweon he would follow up with him with a detailed list of accommodations. When asked why he did not make the accommodation requests to anyone else at the UW, Alley testified that it was because he was working with Kweon, who was "responsible for all resident-related matters" and

"the WPHP who was supposed to be working with me to establish those accommodations" with Kweon and the UW.

On April 27 Alley emailed ADA coordinator Callahan with concerns that a group of faculty members were targeting him before he has time to get accommodations. He expressed concern that it would take several more weeks for him to propose accommodations. The following day Kweon contacted Moss at the WPHP and asked whether Alley needed anything to be set up for success. Moss told him there was nothing at that time and that Alley's treatment provider may be working with him "to try to see if there could be reasonable accommodations that could be made."

On May 3 a chief resident expressed additional performance concerns about Alley.

On May 5 Dr. Kweon emailed Alley regarding his ongoing FOC status and informed Alley that his status would be discussed at the next meeting of the residency program's Clinical Competency Committee (CCC), which exists to evaluate resident performance in the residency program. Alley responded the same day with his "1st draft proposal" of six accommodations "that aims to address the … [Harborview Medical Center] trauma [rotation] issues." Alley testified he wrote the email "seeking accommodations that I hoped would help my current Harborview trauma rotation and my work at Harborview in the future," and he sent the email to Kweon because the WPHP had not recommended accommodations and he had learned that the DSO would take several weeks to recommend accommodations. Alley's email to Kweon stated:

> I believe that a lot of concerns from faculty can be addressed with some reasonable accommodations for the disabilities that I am working with. I would like to open a discussion about this to find the right measures that will help everyone. I am working with my [WPHP] team to draft these, but

below is my 1st draft proposal that aims to address the HMC trauma issues.

The six first-draft proposed "ADA accommodations" suggested ways to carve out extra time for Alley to prepare and organize, "a quiet private work room" to perform tasks "in between operative cases," as well as "rest for a short period of time on service." Alley asked for the CCC to consider his proposed accommodations at its upcoming meeting. He expected his proposals to be accommodated in less than a week.

Kweon did not respond or share Alley's email with the CCC. Alley testified, "No one from the [UW] ever met with me to discuss how my disabilities were affecting my job performance or to discuss with me what accommodations were necessary for my success."

Alley was late to work twice during his third trauma rotation. The second time was on May 11, when Alley was late and missed rounds because he overslept after working 37 hours the previous two days and missed rounds. Alley texted his chief resident Dr. Kacy Peek: "I'm sorry, I have let administration know, I have asked for certain accommodations especially when I've been up for 40 hours+ like last call. Same issue. I'm going to have to take a personal wellness day to finish working out some of these details with Kweon."[6] After he arrived at work, Alley had a confrontational interaction with Peek. Peek directed Alley to contact supervising attending doctors Taitsman and Davies.

Alley did not reach out to Taitsman and Davies as instructed and eventually left the hospital, missing two operations scheduled for his team. That evening Kweon, after learning what had occurred, tried to reach Alley to check on him and let him know he

---

[6] Internal quotation marks omitted.

was suspended from clinical duties pending further investigation. Alley did not respond to Kweon's multiple attempts to reach him until the afternoon of May 12.

On May 13, three days before Alley's third trauma rotation was scheduled to end, the CCC, which included Kweon, met to discuss Alley's second year performance.[7] The CCC would have regularly met to discuss Alley's status in June but moved the meeting up in light of what occurred on May 11.

At the CCC's meeting, trauma rotation faculty reported that Alley had poor clinical proficiency despite remediation and that, even without considering the events of May 11 and 12, Alley was failing the rotation. The committee cited concerns about Alley's deficient knowledge base, poorly organized patient write-ups and presentations, punctuality issues, issues with being present when expected and needed, and his repeated demonstration of a lack of insight and accountability. The voting faculty concluded that Alley had not met the clinical or academic requirements to complete his second year of residency. The committee concluded that "even with more extensive remediation efforts the program would not be able to meaningfully remediate [Alley] to a level consistent with autonomous practice of Orthopaedic surgery by the end of [his] residency at the [UW]" and recommended non-renewal of Alley's contract. The CCC did not discuss Alley's disabilities or his purported need for accommodation.

The following day, May 14, Dr. Kweon sent Alley's "draft" proposed recommendations to Dr. Byron Joyner and Cindy Hamra, deans with the UW's wellness counseling department. Kweon requested assistance because he "did not know how to respond" to this situation and Alley's request came "somewhat out of the blue" and

---

[7] The committee consisted of 17 orthopaedic surgery and sports medicine department faculty members.

struck Kweon as "odd." Kweon testified he did not think of Alley's May 5 email as a formal request because the email stated that Alley wanted to open a discussion about finding the right accommodations, he was working with his WPHP team to draft accommodations, and the email was his first draft proposal. Kweon said, "I didn't really know what to do about it." Kweon understood that accommodation requests should not go directly through program directors. In the May 14 email to Joyner and Hamra, Kweon wrote:

> Additionally, [Alley] requested this accommodation with literally 1 more week and 1 more fracture conference remaining in his current rotation block. 2nd, he has been provided feedback multiple times from me, from his chief residents, and from his faculty at HMC that fracture conference preparation (which most of these requests seem to revolve around) is not something to be done the day of or day before fracture conference occurs and he has been unable to change his behavior regarding this since the fall.

On May 20 Kweon provided Alley with a formal notice of suspension from the residency program "based on continued and heightened concerns about professionalism that have been ongoing for over 6 months." The letter stated that the May 11 incident was "another in a pattern" observed since fall 2020, including continued confrontational interactions with colleagues, abandoning work responsibilities, not taking responsibility for his actions whenever questioned, and continued concerns about the quality of and thoroughness of his clinical care. On June 30 Alley was issued a letter signed by CCC chair Dr. Stephen Kennedy acting in lieu of program director Kweon notifying him of the termination of his residency consistent with the CCC's recommendation.[8]

---

[8] Chansky testified that the wellness department and the program director are the ultimate decisionmakers regarding the non-renewal of a resident's residency. The wellness department concurred with the CCC's conclusions regarding Alley.

Alley filed suit against the UW in January 2023. In his amended complaint, Alley alleges that the UW failed to accommodate his disabilities, terminated his residency because of his disabilities, and did not renew his residency as retaliation for requesting accommodations for his disabilities in violation of the WLAD.[9] The UW moved for summary judgment on all three claims. Alley clarified during the summary judgment proceedings that his discrimination cause of action was a disparate treatment claim. Based on its consideration of the parties' evidence and oral argument,[10] the trial court granted the UW's motion and dismissed Alley's lawsuit on summary judgment.

Alley appeals.

## DISCUSSION

We review a trial court's summary judgment order de novo. LaRose v. King County, 8 Wn. App. 2d 90, 103, 437 P.3d 701 (2019). "Summary judgment is properly granted when the pleadings, affidavits, depositions, and admissions on file demonstrate there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Litvack v. Univ. of Wash., 30 Wn. App. 2d 825, 842, 546 P.3d 1068 (2024) (citing CR 56(c)). Even where an issue typically requires resolution by a fact finder, a court may grant summary judgment as a matter of law where reasonable minds could only reach one conclusion, thus making resolution of a question by a fact finder unnecessary. Old City Hall LLC v. Pierce County AIDS Found., 181 Wn. App. 1, 9-10, 329 P.3d 83 (2014) (citing Lakey v. Puget Sound Energy, Inc., 176 Wn.2d 909, 924, 296

---

[9] Alley also brought a claim of wrongful discharge in violation of public policy that he abandoned at summary judgment. This claim is not at issue on appeal.

[10] At oral argument, the trial court struck as inadmissible hearsay paragraphs 6, 7, and 12 from Alley's declaration submitted in support of his response to the UW's motion for summary judgment. Alley does not challenge these rulings on appeal.

P.3d 860 (2013)). The purpose of summary judgment is to avoid a "'useless trial.'" Davis v. W. One Auto. Grp., 140 Wn. App. 449, 456, 166 P.3d 807 (2007) (internal quotation marks omitted) (quoting Lamon v. McDonnell Douglas Corp., 91 Wn.2d 345, 349, 588 P.2d 1346 (1979)).

When reviewing a summary judgment decision, we only consider evidence and issues that were presented to the trial court. RAP 9.12. We consider all facts and reasonable inferences from such facts in a light most favorable to the nonmoving party. Litvack, 30 Wn. App. 2d at 842. "Affidavits containing conclusory statements without adequate factual support are insufficient to defeat a motion for summary judgment." Guile v. Ballard Cmty. Hosp., 70 Wn. App. 18, 25, 851 P.2d 689 (1993). We may affirm a trial court's summary judgment order on any basis supported by the record. U.S. Bank Nat'l Ass'n v. Roosild, 17 Wn. App. 2d 589, 596, 487 P.3d 212 (2021).

The WLAD prohibits an employer from discriminating against an employee due to "the presence of any sensory, mental, or physical disability."[11] RCW 49.60.180(3). Disability discrimination claims consist of two types: failure to accommodate and disparate treatment. Clipse v. Com. Driver Servs., Inc., 189 Wn. App. 776, 792, 358 P.3d 464 (2015). An employer who fails to accommodate an employee's disability faces an accommodation claim whereas an employer who discharges an employee based on discrimination is subject to a disparate treatment claim. Bittner v. Symetra Nat'l Life Ins. Co., 32 Wn. App. 2d 647, 672, 558 P.3d 177 (2024) (citing Pulcino v. Fed. Express

---

[11] The WLAD defines disability as "the presence of a sensory, mental, or physical impairment that: (i) [i]s medically cognizable or diagnosable; or (ii) [e]xists as a record or history; or (iii) [i]s perceived to exist whether or not it exists in fact." RCW 49.60.040(7)(a). "A disability exists whether it is temporary or permanent, common or uncommon, mitigated or unmitigated, or whether or not it limits the ability to work generally or work at a particular job or whether or not it limits any other activity within the scope of [the WLAD]." RCW 49.60.040(7)(b).

Corp., 141 Wn.2d 629, 640, 9 P.3d 787 (2000), overruled on other grounds by McClarty v. Totem Elec., 157 Wn.2d 214, 226, 137 P.3d 844 (2006)). The WLAD also prohibits employers from retaliating against employees who oppose discriminatory practices. Cornwell v. Microsoft Corp., 192 Wn.2d 403, 411, 430 P.3d 229 (2018) (citing RCW 49.60.210(1)).

The WLAD must be liberally construed to further its purpose of remedying discrimination. Clipse, 189 Wn. App. at 790; RCW 49.60.020. For this reason, summary judgment is often inappropriate in WLAD cases. Gibson v. Costco Wholesale, Inc., 17 Wn. App. 2d 543, 556, 488 P.3d 869 (2021). However, "summary judgment is still appropriate where the plaintiff fails to raise a genuine issue of material fact on one or more of the prima facie elements of a WLAD claim." Id.

Failure to Accommodate

An employee may bring a failure to accommodate claim under the WLAD when their employer does not take reasonably necessary steps to accommodate their disability. Gamble v. City of Seattle, 6 Wn. App. 2d 883, 888, 431 P.3d 1091 (2018).

To establish a prima facie case for an employer's failure to reasonably accommodate an employee's disability that is impairing their ability to perform their job, the employee must show that (1) they had a disability that substantially limited their ability to perform the job, and either (a) the impairment had a substantially limiting effect on the their ability to perform the job or (b) the employee put the employer on notice of the impairment's existence and medical documentation established a reasonable likelihood that engaging in the job functions without an accommodation would create a substantially limiting effect; (2) the employee was qualified to perform the essential

functions of the job at issue; (3) the employee gave the employer notice of the abnormality and its accompanying substantial limitations; and (4) upon notice, the employer failed to affirmatively adopt measures that were available to the employer and medically necessary to accommodate the abnormality. Id. at 888-89 (citing Davis v. Microsoft Corp., 149 Wn.2d 521, 532, 70 P.3d 126 (2003); Johnson v. Chevron U.S.A., Inc., 159 Wn. App. 18, 28, 244 P.3d 438 (2010); RCW 49.60.040(7)(d)).[12]

Under the WLAD, an employer has a duty to reasonably accommodate an employee's disability "unless it 'would impose an undue hardship on the conduct of the employer's business.'" Gamble, 6 Wn. App. 2d at 889 (quoting Doe v. Boeing Co., 121 Wn.2d 8, 18, 846 P.2d 531 (1993)). An employer's duty to accommodate only extends to efforts that are reasonably necessary to enable an employee to perform their job. Doe, 121 Wn.2d at 18. An employer is not required to "remove or modify the essential functions of a position to accommodate an employee." Griffith v. Boise Cascade, Inc., 111 Wn. App. 436, 442, 444, 45 P.3d 589 (2002).

The employer's duty to accommodate is triggered when the employer is aware of the employee's disability and its physical limitations on the employee's ability to perform their work. Gamble, 6 Wn. App. 2d at 889 (citing Goodman v. Boeing Co., 127 Wn.2d 401, 408, 899 P.2d 1265 (1995)); Frisino v. Seattle Sch. Dist. No. 1, 160 Wn. App. 765, 779-80, 249 P.3d 1044 (2011). "The onus is on the employee to 'giv[e] the employer notice of the disability." Gamble, 6 Wn. App. 2d at 889 (alteration in original) (quoting Goodman, 127 Wn.2d at 408).

---

[12] RCW 49.60.040 has been amended since this court's decision in Gamble, but the relevant language under subsection .040(7)(d) remains the same.

Notably, the employee also has a duty to cooperate with the employer's efforts by providing information about their disability and their ability to perform the various functions of their position. Frisino, 160 Wn. App. at 780. The accommodation process requires an employee to supply sufficient information so that their employer can evaluate whether accommodation may be needed. Wurzback v. City of Tacoma, 104 Wn. App. 894, 899, 17 P.3d 707 (2001). Regardless of the type of accommodation requested, the WLAD requires a flexible, interactive process and a good faith exchange of information between the employer and the employee to both determine whether a qualifying disability exists and to determine the reasonableness of accommodations. Gamble, 6 Wn. App. 2d at 892 (citing RCW 49.06.040(7)(d)); Frisino, 160 Wn. App. at 779-80; see Goodman, 127 Wn.2d at 409. An employer may require medical documentation to demonstrate a nexus between the medical condition and the need for accommodation. Riehl v. Foodmaker, Inc., 152 Wn.2d 138, 146-48, 94 P.3d 930 (2004), abrogated on other grounds by Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas County, 189 Wn.2d 516, 404 P.3d 464 (2017). An employee's failure to adequately communicate essential information to the employer can be a basis for dismissing the employee's claim as a matter of law. Id.; see also Mackey v. Home Depot USA, Inc., 12 Wn. App. 2d 557, 586-87, 459 P.3d 371 (2020) (affirming trial court's summary judgment dismissal of failure to accommodate claim based on plaintiff's failure to communicate to employer that the accommodations it provided were not working).

Here, if we assume without deciding that Alley gave notice to the UW of a qualifying disability that substantially limited his ability to perform as a resident in the

19

UW's orthopaedic surgery residency program,[13] Alley failed to show that the UW failed to take affirmative steps to provide reasonable accommodations.

The undisputed evidence shows that, starting with the FOC letter issued in October 2020, the UW consistently referred Alley to its DSO in the event he wanted to request accommodation for his disabilities to perform his job as a resident. When he eventually decided to contact the UW's DSO in January 2021, Alley was provided with information about the accommodation process and forms to start the process, including a healthcare provider's statement as medical support for the requested accommodation. Alley failed to provide the required information to initiate the process.

Relying on his own testimony that multiple people at the WPHP told him that he was not allowed to unilaterally pursue accommodation,[14] Alley argues that the WPHP thwarted his ability to pursue the DSO process to request accommodation from the UW.

Viewed in the light most favorable to Alley, even if it could be argued that his initial delay in contacting the DSO was based on a good faith belief that any request for accommodation had to go through the WPHP, that concern was no longer the case when Alley communicated with the DSO in January 2021. Alley could not recall whether the WPHP told him not to work directly with the DSO after he contacted the DSO in January. See Overton v. Consol. Ins. Co., 145 Wn.2d 417, 431, 38 P.3d 322 (2002)

---

[13] Or alternatively, that medical documentation established a reasonable likelihood that engaging in his resident job without an accommodation would create a substantially limiting effect. See RCW 49.60.040(7)(d)(ii).

[14] Alley is correct that the UW did not raise a hearsay objection during the summary judgment proceedings as to Alley's relaying statements the WPHP made to Alley. Thus, that argument by the UW is waived. See Bonneville v. Pierce County, 148 Wn. App. 500, 509, 202 P.3d 309 (2008) ("If a party fails to object or bring a motion to strike deficiencies in affidavits or other documents in support of a motion for summary judgment, the party waives any defects."). However, we note that we do not consider inadmissible evidence in reviewing a summary judgment order. Larson Motors, Inc. v. Snypp, 3 Wn. App. 2d 127, 136, 413 P.3d 632 (2018).

("Lack of recall is not sufficient to controvert clear opposing evidence on a summary judgment motion."). He does not assert that he was prevented from seeking medical documentation to support an accommodation request. Rather, Alley acknowledged that he had an opportunity to initiate the interactive process to request accommodations from the UW when he communicated with the DSO in January but chose not to submit a request because things were going well after the WPHP endorsed him to return to work the following month.

Moreover, nothing in the record supports that the UW directed the WPHP to restrict Alley from seeking accommodations. When Alley informed his supervisor Kweon that his shift work sleep disorder was affecting his job performance in late April 2021, Kweon reminded him that he could request accommodations through the DSO. Alley again failed to initiate the process. Alley's own evidence showed that the WPHP asked the UW's wellness department in late April where a possible accommodation request for Alley should be directed, and UW "responded DSO."

Claiming that it was unreasonable for Kweon not to respond to his request for accommodation, Alley points to evidence that the UW's policy allows an employee to begin the process of requesting accommodation by discussing their needs with their supervisor, contacting human resources, or contacting the DSO. But the policy instructs supervisors to direct employees seeking accommodations to the DSO. This is precisely what Kweon, and the UW's ADA coordinator Callahan, did.

The UW policy also indicates that the employee may be required to complete forms for accommodation requests. Undisputed evidence established that to evaluate whether accommodation is needed, it is preferred that an employee's supervisor

21

redirect them to the DSO and that the interactive process typically only begins when the employee requests accommodation through the DSO and provides supporting medical information for accommodation. The employee must submit a form to the UW's disability services to explain what accommodation they are requesting and the employee's program implements an accommodation after the DSO has vetted the accommodation and determined it to be reasonable. Alley's own evidence established that the residency program cannot make any accommodations for a resident on its own. Instead, requests must go through disability services and "[o]nly then can a program accommodate a resident."

Rather than submitting a request to the DSO with supporting medical information in February when Alley was permitted to return to work, Alley emailed a "draft proposal" of disability accommodations to Kweon nearly three months later. The record supports that though Kweon reminded him of the DSO process for submitting accommodation requests, Alley did not submit a request to the DSO because he did not want to wait for the DSO to provide accommodation recommendations. Alley's personal decision to sidestep the UW's DSO process for fielding and responding to accommodation requests does not equate to evidence that the UW failed to take reasonably necessary steps to accommodate his disability.

Alley submitted evidence that Kweon did not know what to do with the May 5 email and did not view it as a formal request. In context, this was after Kweon had repeatedly directed Alley to submit any request for accommodation to the DSO; after Kweon was previously told by the WPHP that Alley may be working with treatment providers to see if reasonable accommodations could be made; after the WPHP, who

continued to monitor Alley, determined Alley was fit to perform his job; and after Alley had been unable to change his behavior over the course of several months and was close to—only one week from—finishing his last trauma rotation. Notably, Kweon understood that accommodation requests should not go through program directors.

Alley had a duty to cooperate with the UW's accommodation request process established through the DSO by providing requested information to allow the UW to evaluate whether and what accommodation may be needed for his disabilities. See Goodman, 127 Wn.2d at 408-09; Frisino, 160 Wn. App. at 780. Viewing the instant record in a light most favorable to Alley, no reasonable factfinder could find that he fulfilled this duty to engage in an interactive process with the UW regarding his purported need for accommodation. The record therefore presents no genuine dispute of material fact as to whether Alley met his obligation to cause the UW to do more than what it did—direct Alley to submit his accommodation request to the DSO.

Moreover, the UW was not required to delay action regarding Alley's past performance issues to respond to his May 5 email of draft accommodation proposals. Here, the CCC determined that, even without the events of May 11 and 12, Alley was failing his third trauma rotation. The committee unanimously decided that Alley's performance in the residency program could not be remediated.

"In a reasonable accommodation case, 'the central idea is that an employer cannot fire an employee for poor job performance if the poor job performance was due to [a disability] and reasonable accommodation would have rectified the problem.'" Dedman v. Wash. Pers. Appeals Bd., 98 Wn. App. 471, 484 n.14, 989 P.2d 1214 (1999) (alteration in original) (quoting Parsons v. St. Joseph's Hosp., 70 Wn. App. 804, 807,

856 P.2d 702 (1993)). However, "'[r]easonable accommodation is always prospective, an employer is not required to excuse past misconduct even if it is the result of the individual's disability.'" Trahan v. Wayfair Maine, LLC, 957 F.3d 54, 65 (1st Cir. 2020) (quoting Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, U.S. EQUAL EMP'T OPPORTUNITY COMM'N (Oct. 17, 2002), https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada [https://perma.cc/5ZD5-TQ53]); see also Trahan, 957 F.3d at 65 ("[T]he ADA does not oblige an employer to accommodate an employee's disability retroactively.").[15] An accommodation request that follows fireable misconduct "should not be viewed as an accommodation proposal at all" but "is better understood as a plea either for forgiveness or for a second chance." Id. (citing Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 90 (1st Cir. 2012); DeWitt v. Sw. Bell Tel. Co., 845 F.3d 1299, 1316 (10th Cir. 2017); Hill v. Kan. City Area Transp. Auth., 181 F.3d 891, 894 (8th Cir. 1999)); see also Gamble, 6 Wn. App. 2d at 895 ("'[N]either the law nor common sense can demand clairvoyance of an employer.'") (quoting Conneen v. MBNA America Bank, N.A., 334 F.3d 318, 331 (3rd Cir. 2003)).

We are not persuaded by Alley's claim in his reply brief that his behavior that preceded his purported accommodation request in late April and early May 2021 was not "misconduct." Regardless of how the UW chose to address Alley's behavior leading up to his dismissal, the record supports that he was not meeting performance or professional standards beginning with his first trauma rotation in or around fall 2021.

---

[15] "Washington courts look to federal case law interpreting antidiscrimination statutes as a guide to interpreting the WLAD." Williams v. Dep't of Soc. & Health Servs., 24 Wn. App. 2d 683, 698, 524 P.3d 658 (2022) (citing Kumar v. Gate Gourmet Inc., 180 Wn.2d 481, 491, 325 P.3d 193 (2014)); see Gamble, 6 Wn. App. 2d at 894-95.

Any potential accommodation could not retroactively cure such past performance issues. See Trahan, 957 F.3d at 65.

Because Alley failed to engage and cooperate with the UW's accommodation request process, we conclude that the trial court did not err in dismissing, as a matter of law, his claim of failure to accommodate.

Disparate Treatment

Alley claims that the UW wrongfully terminated his residency because of his disabilities. He asserts that the UW violated the WLAD's prohibition against an employer discharging an employee due to disability under RCW 49.60.180. An employer's violation of RCW 49.60.180(2) supports a discriminatory discharge claim. Anica v. Wal-Mart Stores, Inc., 120 Wn. App. 481, 488, 84 P.3d 1231 (2004); Bittner, 32 Wn. App. 2d at 671-72. A prima facie claim for a disparate treatment case of disability discrimination requires that the employee show they were 1) disabled; 2) subject to an adverse employment action; 3) doing satisfactory work; and 4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. Anica, 120 Wn. App. at 488.

Because direct evidence of discriminatory intent is rare, an employee "'may rely on circumstantial, indirect, and inferential evidence to establish discriminatory action.'" Mackey, 12 Wn. App. 2d at 571 (quoting Mikkelsen, 189 Wn.2d at 526). Where an employee alleges discriminatory discharge based on circumstantial rather than direct evidence, Washington courts use the three-step evidentiary burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Mackey, 12 Wn. App. 2d at 571 (citing Mikkelsen, 189 Wn.2d at 526-

27; Scrivener v. Clark Coll., 181 Wn.2d 439, 445-46, 334 P.3d 541 (2014)). This framework applies to both discrimination and retaliation claims. Id. (citing Cornwell, 192 Wn.2d at 411).

The McDonnell Douglas analysis requires an employee-plaintiff to first produce sufficient circumstantial evidence to establish a prima facie case of discriminatory discharge or retaliation. Bittner, 32 Wn. App. 2d at 658 (citing Mackey, 12 Wn. App. 2d at 571). Second, if the employee makes this showing, the burden shifts to the employer to articulate a legitimate and nondiscriminatory or nonretaliatory reason for the employee's discharge. Id. (citing Mackey, 12 Wn. App. 2d at 571). Third, if the employer meets this burden, the employee must produce sufficient circumstantial evidence showing that the employer's stated reason for the discharge was pretextual. Id. at 658-59 (citing Mackey, 12 Wn. App. 2d at 572).

Regarding the third pretext prong, an employee may defeat summary judgment by presenting "sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is pretextual or (2) that although the employer's stated reason is legitimate, discrimination nevertheless was a substantial factor motivating the employer.'" Mackey, 12 Wn. App. 2d at 572 (internal quotation marks omitted) (quoting Mikkelsen, 189 Wn.2d at 527).

Here, because Alley has no direct evidence that the UW terminated him from the orthopaedic surgery residency program due to his disabilities, the McDonnell Douglas burden-shifting framework applies. See id. (citing Scrivener, 181 Wn.2d at 445).

Alley's challenge on appeal focuses on the third step of the McDonnell Douglas framework. For the purposes of this analysis, we assume without deciding, as the trial

26

court did, that Alley established a prima facie claim for disparate treatment. Alley does not dispute that the UW satisfied the second step under McDonnell Douglas by showing that it terminated Alley from its residency program for the legitimate and non-discriminatory reason of poor job performance. Alley instead argues that he presented sufficient evidence to establish a material dispute as to whether the UW's non-discriminatory basis for his dismissal was pretextual or substantially motivated by a discriminatory factor.

*A. Similarly Situated Comparator*

"'One test for pretext is whether (1) an employee outside the protected class (2) committed acts of comparable seriousness (3) but was not demoted or similarly disciplined.'" Litvack, 30 Wn. App. 2d at 846 (quoting Johnson v. Dep't of Soc. & Health Servs., 80 Wn. App. 212, 227, 907 P.2d 1223 (1996)). That is, whether the employer's purported reason "'was not a motivating factor in employment decisions for other employees in the same circumstances.'" Scrivener, 181 Wn.2d at 448 (quoting Kuyper v. Dep't of Wildlife, 79 Wn. App. 732, 738-39, 904 P.2d 793 (1995)).

Appropriate comparators for the sake of pretext showing are employees that are "'similarly situated'" to the plaintiff and doing "'substantially the same work'" as the plaintiff. Litvack, 30 Wn. App. 2d at 846 (quoting Johnson, 80 Wn. App. at 227). "'Similarly situated employees must have the same supervisor, be subject to the same standards, and have engaged in the same conduct.'" Marin v. King County, 194 Wn. App. 795, 810, 378 P.3d 203 (2016) (quoting Kirby v. City of Tacoma, 124 Wn. App. 454, 475 n.16, 98 P.3d 827 (2004)).

Alley argues that a non-disabled orthopaedic surgery resident, "Resident X," "who had a constellation of issues and one of them was lateness" also was referred to the WPHP, but was allowed to complete the second year of their residency. Alley argues that this non-disabled resident was treated less harshly than him for more egregious performance issues. Resident X's other issues included a "profound lack of medical knowledge that he should have had from medical school, not from his residency; profound lack of orthop[a]edic basic knowledge; technical difficulties operating; and sometimes allegations of dishonesty."

Even assuming that non-disabled Resident X was similarly situated to Alley, the record does not support a reasonable inference that Resident X was treated more favorably than Alley. Like Alley, the other underperforming Resident X was referred to the WPHP. Eventually the WPHP endorsed the resident to return to work after about eight and a half months. At that time, Resident X's cohort was already in its third year, and the UW required him to restart the second year with a new cohort. The resident did not receive any credit from this second year. After Resident X's performance issues persisted, the committee recommended mid-year dismissal. The resident opted to resign in lieu of dismissal.

Alley claims he was not allowed the same opportunity as Resident X to repeat and complete the two years of his residency program to obtain a license to practice medicine under RCW 18.71.050(1)(b). This complaint disregards the fact that Alley was permitted, upon the WPHP's endorsement, to return to his second residency year and that it was only after his continued performance issues that the committee recommended his dismissal from the program. Alley provides no record cites to

28

establish that Resident X was allowed to complete the second year of his residency despite the committee's mid-year dismissal recommendation. See RAP 10.3(a)(6) (requiring an appellant's brief to provide "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record"). This is insufficient to defeat summary judgment.[16] See Cornwell, 192 Wn.2d at 420 (stating that the standard to avoid summary judgment "requires the production of evidence; mere speculation will not suffice to defeat summary judgment").

Alley also argues that he was treated more harshly than other residents who also received PSN complaints at Harborview Medical Center. Alley asserts that the UW terminated him, "at least in part," for receiving a single PSN complaint for performing a procedure on a patient without administering anesthesia. Alley submitted, as a comparison, documents produced by UW of 90 PSN complaints issued against other orthopaedic providers and testified that PSNs are generally reputed as "non-disciplinary." However, the record does not establish that any of the recipients of these PSNs were similarly situated to Alley in terms of additional performance issues that contributed to his termination. See Marin, 194 Wn. App. at 810.

We conclude that Alley has not met his burden to raise a genuine issue of material fact as to whether UW's articulated reason for Alley's termination was pretextual. A reasonable factfinder could not find on this record that Alley produced

---

[16] We need not consider Alley's unsupported claim that the CCC strategically recommended Resident X's dismissal to bolster its defense in this litigation. Alley provides no evidence to support that had it not been for his lawsuit, the CCC would not have recommended Resident X's dismissal from the residency program. Alley cites inapposite federal case law. See Gonzales v. Police Dep't, City of San Jose, 901 F.2d 758, 761-62 (9th Cir. 1990) (holding that "[c]urative measures simply do not tend to prove that a prior violation did not occur" in Title VII discrimination cases).

evidence that the UW's explanation for terminating his residency based on poor performance was "unworthy of belief" to support the reasonable inference that the UW was motivated by an intent to discriminate. Kirby, 124 Wn. App. at 468-69. Accordingly, summary judgment is proper. See Kuyper, 79 Wn. App. at 739.

Retaliation

Alley claims that the UW violated the WLAD's prohibition of an employer's retaliation against an employee for opposing any discriminatory practices barred by the WLAD. See RCW 49.60.210(1). Violation of the WLAD's prohibition under RCW 49.60.210(1) supports a retaliation claim. Mackey, 12 Wn. App. 2d at 570 (citing Cornwell, 192 Wn.2d at 411). To establish a prima facie case of retaliation, an employee must show that (1) they engaged in a statutorily protected activity, (2) their employer took an adverse employment action against them, and (3) there is a causal connection between the employee's activity and the employer's adverse action. Cornwell, 192 Wn.2d at 411.

In the instant case, Alley contends that the UW discharged him from the residency program as retaliation for requesting disability accommodation as protected by the WLAD. As stated above, the McDonnell Douglas burden-shifting framework applies to retaliation claims. Mackey, 12 Wn. App. 2d at 571 (citing Cornwell, 192 Wn.2d at 411). Because Alley relies on circumstantial evidence to support his retaliation claim, our analysis thus falls under the McDonnell Douglas three-step framework.

Like his argument in support of his disparate treatment claim, Alley focuses on the third step of McDonnell Douglas. Based on the nature of Alley's challenge, we assume, without deciding, that Alley established a prima facie case of retaliation. Alley

does not challenge that the UW met its burden under the second step to articulate a legitimate and nondiscriminatory or nonretaliatory reason for his discharge.

To show that the UW's nonretaliatory reason for his dismissal was pretextual or that it was substantially motivated by retaliation against him for seeking disability accommodation, Alley in part relies on the same comparator evidence that we determined insufficient as to his disparate treatment claim discussed above. Additionally, Alley relies on temporal proximity between his May 5, 2021, email request for accommodations and the termination of his residency eight days later. But we have previously held that an employee must show more than temporal proximity to satisfy the third step of the McDonnell Douglas framework for a retaliation claim. Mackey, 12 Wn. App. 2d at 585 (concluding that the mere fact that employer terminated employee 12 days after she complained about an assistant manager's conduct was not sufficient to create an inference that retaliation was a substantial motivating factor for her termination). Therefore, we conclude that Alley has not met his burden to raise a genuine question of material fact as to whether his dismissal from the UW's residency program was an act of retaliation under the WLAD. See id. at 582, 585.

Attorney Fees and Costs on Appeal

The UW requests costs under RAP 14.1 and RAP 14.2 and Alley requests attorney fees under RAP 18.1 and RCW 49.60.030(2).[17] RAP 14.2 provides that costs will be awarded to the prevailing party on appeal, and RAP 18.1 allows for the recovery of reasonable attorney fees if applicable law grants the right to such recovery. As the prevailing party on appeal, the UW is entitled to an award of costs under RAP 14.2. See

---

[17] RCW 49.60.030(2) allows for the recovery of reasonable attorney fees by a person injured by a violation of the WLAD.

Hurley v. Port Blakely Tree Farms L.P., 182 Wn. App. 753, 774, 332 P.3d 469 (2014)

(RAP 14.2 provides for award of costs to party that substantially prevails on appeal).

Because he does not prevail on appeal, Alley cannot recover fees.

CONCLUSION

We affirm.

_Cohen, J._

WE CONCUR:

_Bui, J._          _Díaz, J._